COMMONWEALTH of Pennsylvania, Appellee

v.

Nashadeem BOSTICK, Appellant.

Superior Court of Pennsylvania.

Submitted July 28, 2008.

Filed Sept. 30, 2008.

Gary S. Server, Philadelphia, for appellant.

Hugh J. Burns, Jr., Asst. Dist. Atty., for Com., appellee.

* Retired Senior Judge Assigned to the Superior Court.

1. 35 P.S. § 780–113(a)(30).

BEFORE: MUSMANNO, BENDER and COLVILLE *, JJ.

OPINION BY BENDER, J.:

¶ 1 Nashadeem Bostick appeals from the judgment of sentence of five to ten years' imprisonment imposed following his convictions of possession with intent to deliver a controlled substance (PWID)[1] and conspiracy.[2] Appellant challenges the trial court's denial of his pretrial motion to suppress evidence and the sufficiency of the evidence. We affirm.

¶ 2 The trial court set forth the following facts in its opinion filed pursuant to Pa. R.A.P.1925(a):

On December 16, 2006, at approximately 7:00 a.m., Officers [Paul] Perez and [Richard] Rivera were conducting plainclothes surveillance of the area at 8th and Indiana Streets in Philadelphia, with several other officers acting in back-up capacity (N.T. 06/22/07 at 13–15, 16). At the time the officers arrived, a black male, who was never identified, was standing alone at the northeast corner of 8th and Indiana Streets (N.T. 06/22/07 at 17). At 7:15 a.m., a male identified as Melvin Lyons drove up and engaged the unknown male in a brief hand-to-hand transaction, during which Lyons handed the unknown male currency in exchange for small items (N.T. 06/22/07 at 17–18, 19). After Lyons left the area, he was stopped by Officer Crawford, who recovered from his person, two clear, heat-sealed packets of a heroin/fentanyl mixture, stamped "High class the best" (N.T. 06/22/07 at 54–55, 161).

At approximately 7:50 a.m., the officers saw the defendant exit a property at 3018 N. 8th Street, which was located

2. 18 Pa.C.S. § 903(a)(1).

approximately a quarter block away from the corner of 8th and Indiana (N.T. 06/22/07 at 20, 24–25, 36–37). Defendant then walked over to the unknown black male, engaged him in conversation, and handed him small items (N.T. 06/22/07 at 20, 36–37). Shortly thereafter, defendant and the unknown male were approached by another male identified as Ronald Keels, who engaged both men in a brief conversation before handing the defendant U.S. currency (N.T. 06/22/07 at 20–21, 22). Defendant then handed Keels small items in a fist-over-hand motion before Keels left the area (N.T. 06/22/07 at 21, 38). Officer Washington stopped Keels and recovered from his right coat pocket, one white glassine packet, which was stamped "Class the best," and which contained a heroin/fentanyl mixture (N.T. 06/22/07 at 61, 64–65, 161).

After this transaction, defendant walked over to a black 1995 GMC Jimmy, opened the car door, and placed something inside the center console (N.T. 06/22/07 at 23–24, 39–40). He then reentered the property at 3018 N. 8th Street for a short time before rejoining the unknown male on the corner (N.T. 06/22/07 at 23–24, 25–26, 42). The pair was then approached by a male on a bike, identified as Larry Whitehead, who briefly spoke with the defendant before handing the defendant U.S. currency (N.T. 06/22/07 at 26, 42). The defendant then gave Whitehead small objects, and Whitehead left the area (N.T. 06/22/07 at 26, 42). The unknown black male, thereafter, walked away and was not seen again (N.T. 06/22/07 at 27–28). Officer Taylor stopped Whitehead, who, upon seeing police, placed something in his mouth, which was recovered and found to be a clear heat-sealed packet (N.T. 06/22/07 at 77–78, 161–62). That packet contained a white glassine packet

of a heroin/fentanyl mixture, which was stamped "High class the best" (N.T. 06/22/07 at 77–78, 81, 161–62).

Defendant thereafter re-entered the property at 3018 N. 8th Street for a short time, and then went back over to the GMC Jimmy, again placing items inside the vehicle's center console (N.T. 06/22/07 at 28, 42–43). As he got out of the car, the defendant was suddenly surrounded by numerous unknown males, who were each handing him money (N.T. 06/22/07 at 29). Upon seeing officers, defendant fled northbound on 8th Street, but was caught and arrested soon thereafter by Officer Campbell (N.T. 06/22/07 at 29, 35–36, 88–89, 104–105). The officer recovered $746 from defendant's person, in the following denominations: twenty-five $20 bills; sixteen $10 bills; ten $5 bills; and thirty-six $1 bills (N.T. 06/22/07 at 49, 89–90).

Thereafter, a man identified as Jerome Sanders opened the door to exit the property at 3018 N. 8th Street, and, upon seeing officers, dropped some items to the floor in the home's vestibule (N.T. 06/22/07 at 90, 105, 108). Sanders was thereafter arrested, and $125 was recovered from his person (N.T. 06/22/07 at 92–93, 105). In addition, five packets of marijuana were recovered from the vestibule floor (N.T. 06/22/07 at 91–93, 105, 162). When officers subsequently entered the property to secure it and to assure that no one else was present who could destroy evidence, a man identified as John Boyd was seen exiting the middle bedroom on the second floor (N.T. 06/22/07 at 30, 96, 105–06, 108). In plain view, on a table just inside the bedroom's open door, were seven bundles of clear heat-sealed packets containing white glassine packets of a heroin/fentanyl mixture (N.T. 06/22/07 at 106–07, 145, 163). Everyone present in the

house was arrested (N.T. 06/22/07 at 97, 100, 157).

Officers thereafter executed search warrants on both the GMC Jimmy and the property at 3018 N. 8th Street (N.T. 06/22/07 at 118). From the center console of the GMC Jimmy, officers recovered $1,500 in cash (N.T. 06/22/07 at 118–119, 150). From various shoeboxes in the rear bedroom on the home's second floor, officers recovered: (1) numerous new and unused small Ziplock packets; (2) new and unused glass jars; (3) two boxes of sandwich bags; (4) two scales—one handheld and one digital; (5) one operable AK–47 assault rifle with a magazine containing twenty .32 caliber rounds; (6) one scanner capable of receiving police transmissions; (7) two walkie talkies; (8) $1,354 cash; and (9) large quantities of marijuana, crack cocaine, heroin, heroin/fentanyl mixture, and PCP oil, which were both in bulk and in individually packaged forms (N.T. 06/22/07 at 121–126, 130–32, 142, 163–65). From the middle bedroom, officers recovered eighty-seven heat-sealed packets, which were rubberbanded into bundles, and each of which contained a white glassine piece of paper stamped "Class the best" (N.T. 06/22/07 at 106–07, 125, 145, 163). Eleven of these packets contained pure fentanyl, and seventy-six contained a heroin/fentanyl mixture (N.T. 06/22/07 at 163). From the living room of the home, officers recovered a PGW bill addressed to Darell Cooper, a welfare letter addressed to defendant, and Pennsylvania identification cards belonging to the defendant and to Darell Cooper (N.T. 06/22/07 at 128, 136–37). According to Officer Burgess, an expert in narcotics packaging and narcotics distribution, the drugs in the house were possessed with the intent to deliver (N.T. 06/22/07 at 171–72, 189).

After the Commonwealth rested, the defense presented testimony from Darlene Cooper, who stated that she rented the residence at 3018 N. 8th Street (N.T. 06/25/07 at 7). She testified that, on the date in question, she, Sanders, and a man named Hakeem Ray, were in the dining room when they heard a loud noise outside (N.T. 06/25/07 at 8–9). When Ray opened the front door, the police rushed in and arrested everyone in the house (N.T. 06/25/07 at 8–10). She further testified that, prior to the time Sanders dropped marijuana on the floor in front of police, she had never seen any contraband in the house, and that anyone could have had access to the rear bedroom, which had no locks (N.T. 06/25/07 at 9, 10, 12–13, 15–16, 19–20). She also testified that, although defendant was an occasional weekend visitor, he did not reside in the home (N.T. 06/25/07 at 7–8, 16).

Trial Court Opinion (T.C.O.), 12/12/07, at 2–5.

¶ 3 On June 21, 2007, the trial court held a hearing on Appellant's pretrial "Motion to Suppress Physical Evidence." Following the hearing, the trial court denied Appellant's motion to suppress, and Appellant proceeded to trial before a jury. On June 25, 2007, the jury found Appellant guilty of PWID and conspiracy.[3] On August 3, 2007, the trial court sentenced Appellant to an aggregate term of five to ten years' imprisonment. Appellant filed this timely notice of appeal and a timely concise statement of matters complained of on appeal pursuant to Pa.R.A.P.1925(b), in accordance with the trial court's order, in which he preserved the following issues that he now raises in the instant brief:

---

**3.** The jury found Appellant not guilty, however, of possessing an instrument of crime.

I. Whether the Court erred in denying the suppression motion where the Commonwealth did. not bear its burden of proving that probable cause existed to seize property allegedly within Appellant's dominion or control and where the police exceeded the scope of their authority during a protective sweep.

II. Whether there was sufficient evidence for the jury to conclude that the Appellant was a conspirator in the distribution of illegal substances or that he had dominion or control over the stash of drugs found in the middle bedroom.

Appellant's brief at 6. We address these issues in the order presented.

■■ ¶ 4 "The appellate standard of review of suppression rulings is well-settled. This Court is bound by those of the suppression court's factual findings which find support in the record, but we are not bound by the court's conclusions of law." *Commonwealth v. Millner*, 585 Pa. 237, 888 A.2d 680, 685 (2005). *See also Commonwealth v. Booze*, 953 A.2d 1263, 1268–69 (Pa.Super.2008) ("Where the record supports findings of the suppression court, we are bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error.").

¶ 5 As the basis for his argument that the seizure in this case contravened Appellant's constitutional rights, Appellant contends that the initial warrantless entry of the residence at 3018 N. 8th Street and the protective sweep that followed (prior to the police obtaining the search warrant) were illegal and that information obtained from those activities improperly formed the basis of the subsequent search warrant, thereby requiring suppression of the evidence recovered from the residence.[4]

¶ 6 We conclude initially that the warrantless entry into the residence did not violate Appellant's constitutional right against unreasonable search and seizure, as contained in both the Fourth Amendment to the United States Constitution and Article 1, Section 8 of the Pennsylvania Constitution. Accordingly, the trial court properly denied Appellant's motion to suppress. However, as the trial court based its decision in large part on its belief that Appellant did not have standing or a reasonable expectation of privacy in the premises searched, we examine those conclusions first, as a threshold matter. *See, e.g., Commonwealth v. Peterson*, 535 Pa. 492, 636 A.2d 615, 618 (1993) (addressing the predicate issue of standing to assert a constitutional claim of unreasonable search and seizure in the first place, even though the appellant's argument focused on whether exigent circumstances existed to make the warrantless entry).

■■ ¶ 7 Both the Fourth Amendment of the United States Constitution and Article 1, Section 8 of the Pennsylvania Constitution "guarantee individuals freedom from unreasonable searches and seizures." *Commonwealth v. El*, 933 A.2d 657, 660 (Pa.Super.2007). "The concept of standing in a criminal search and seizure context

---

4. Although both the trial court and the Commonwealth contend that Appellant's first issue is waived, we disagree. The critical issue of whether police officers acted illegally in entering the residence without a search warrant and conducting what is characterized as a "protective sweep" therein was raised and litigated in both Appellant's written suppression motion and at the hearing. *See, e.g.,* Motion to Suppress Physical Evidence, 6/17/07, at ¶ 5 (contending initial search conducted "without a warrant, without consent or in the absence of exigent circumstances to justify the failure to obtain a search warrant"); N.T. Hearing at 7 (defense counsel arguing that police entered the residence without a warrant in the absence of exigent circumstances or consent).

empowers a defendant to assert a constitutional violation and thus seek to exclude or suppress the government's evidence pursuant to the exclusionary rules under the Fourth Amendment of the United States Constitution or Article 1, Section 8 of the Pennsylvania Constitution." *Commonwealth v. Hawkins*, 553 Pa. 76, 718 A.2d 265, 266 (1998). As our Supreme Court further explained in *Hawkins:*

> The traditional formulation for standing requires a defendant to demonstrate one of the following personal interests:
>
> > (1) his presence on the premises at the time of the search and seizure; (2) a possessory interest in the evidence improperly seized; (3) that the offense charged include[s] as an essential element of the prosecution's case, the element of possession at the time of the contested search and seizure; or (4) a proprietary or possessory interest in the searched premises.
>
> *Commonwealth v. Peterkin*, 511 Pa. 299, 309, 513 A.2d 373, 378 (1986).... This Court has accorded standing automatically, with no preliminary showing of a proprietary or possessory interest by the defendant, in the third of these circumstances, namely, where possession at the time of the contested search and seizure is an essential element of the prosecution's case. *See Peterkin*, 511 Pa. at 309, 513 A.2d at 378....
>
> This doctrine of automatic standing has its genesis in the decisions of the United States Supreme Court. *See Jones v. United States*, 362 U.S. 257,

264, 80 S.Ct. 725, 732–33, 4 L.Ed.2d 697 (1960).... As a matter of Fourth Amendment jurisprudence, however, the United States Supreme Court has abandoned the construct in favor of a requirement that a defendant establish a legitimate expectation of privacy in the invaded place as a predicate to standing. *See United States v. Salvucci*, 448 U.S. 83, 85, 100 S.Ct. 2547, 2549, 65 L.Ed.2d 619 (1980).

> While this Court has stated that automatic standing maintains continued vitality under Article 1, Section 8 of the Pennsylvania Constitution, *see Commonwealth v. Sell*, 504 Pa. 46, 66–68, 470 A.2d 457, 468–69 (1983); *see also [Commonwealth v.] Peterson*, 535 Pa. [492,] 497, 636 A.2d [615,] 617 [ (1993) ], these decisions have recognized that the essential effect is to entitle a defendant to an adjudication of the merits of a suppression motion. *See id.* at 497, 636 A.2d at 617. In order to prevail on such a motion, however, a defendant is required to separately demonstrate a personal privacy interest in the area searched or effects seized, and that such interest was "actual, societally sanctioned as reasonable, and justifiable." *Peterson*, 535 at 497, 636 A.2d at 617.

*Hawkins*, 718 A.2d at 267.[5]

 ¶ 8 At the inception of the suppression hearing, the trial court questioned Appellant's standing to litigate his suppression motion. *See* N.T. Hearing, 6/21/07, at 4.[6] However, because Appellant

---

5. In *Sell*, 470 A.2d at 461, our Supreme Court provided extensive discourse on the development and purpose of automatic standing in cases of possessory crimes. Essentially, the doctrine was developed to address the predicament of a defendant charged with a possessory crime who, to establish standing, claims a privacy interest in the material seized at the

time he seeks to have the evidence suppressed prior to trial, but who later risks the possibility of use of his prior admissions of possession by the prosecution at trial to obtain a conviction.

6. For example, the court asked, "[C]an you show standing for the house? Did he live there?" and, "Why am I litigating this mo-

was charged with possessory crimes, he had automatic standing to litigate his suppression motion. *Sell,* 470 A.2d at 469. Even so, to be successful in his motion, Appellant had to also establish that he had a reasonable expectation of privacy in the house. The trial court determined that Appellant did not have a reasonable expectation of privacy in the house. We conclude that the trial court's determination in this regard was legally erroneous.

An expectation of privacy will be found to exist when the individual exhibits an actual or subjective expectation of privacy and that expectation is one that society is prepared to recognize as reasonable. In determining whether a person's expectation of privacy is legitimate or reasonable, the totality of the circumstances must be considered and the determination will ultimately rest upon a balancing of the societal interests involved. "The constitutional legitimacy of an expectation of privacy is not dependent on the subjective intent of the individual asserting the right but on whether the expectation is reasonable in light of all the surrounding circumstances."

*Commonwealth v. Viall,* 890 A.2d 419, 422 (Pa.Super.2005) (citations omitted). *See also Commonwealth v. Gordon,* 546 Pa. 65, 683 A.2d 253, 256 (1996) (setting forth a two-prong test a defendant must meet to establish violation of Pennsylvania constitutional right against unreasonable search and seizure, namely, a defendant must "(1) have exhibited a subjective expectation of privacy and (2) have demonstrated that the expectation is one that society is prepared

to recognize as reasonable and legitimate").

¶ 9 Indeed, "the Fourth Amendment does not shield only those who have title to the searched premises." *Commonwealth v. Ferretti,* 395 Pa.Super. 629, 577 A.2d 1375, 1377 (1990). Rather, "a defendant must establish a possessory interest, a legitimate presence, or some 'factor from which a reasonable and justifiable expectation of privacy could be deduced' to prove that this subjective expectation of privacy is legitimate." *Gordon,* 683 A.2d at 257 (citation omitted). Thus, even if not an owner or lessee of the premises, "a defendant who is more than a casual visitor to the ... dwelling in which illegal drugs have been seized has the right under the Fourth Amendment to the United States Constitution ... to challenge the search and seizure of the illegal drugs which he is accused of possessing." *Commonwealth v. Rodriguez,* 451 Pa.Super. 474, 679 A.2d 1320, 1325 (1996) (citation omitted). *See also United States v. Fields,* 113 F.3d 313, 320 (2d Cir.1997) (citations omitted) ("Residence may give rise to an expectation of privacy, but an individual may also have a 'sufficient interest in a place other than his own home so that the Fourth Amendment protects him.' ").

¶ 10 In *Commonwealth v. Govens,* 429 Pa.Super. 464, 632 A.2d 1316 (1993) *(en banc),* this Court reiterated that a person who is more than a casual visitor to a dwelling in which illegal drugs have been seized has standing to challenge the search and seizure of the drugs he is accused of possessing, but "an occupant other than the owner or lessee of an apartment [must] demonstrate a significant and current in-

tion? How does he have an expectation of privacy in the house?" N.T. Hearing at 4, 5. From these comments, it is apparent that the court did not recognize that, under Pennsylvania law, Appellant had automatic standing to litigate the motion. However, despite the

court's misapprehension regarding automatic standing, it permitted the hearing to occur with the presentation of testimony, and with the court ultimately concluding, as we shall describe, that Appellant did not have a reasonable expectation of privacy in the house.

terest in the searched premises in order to establish an expectation of privacy." *Govens*, 632 A.2d at 1319 (quoting *United States v. Garcia*, 741 F.2d 363, 366 (11th Cir.1984)). We further stated that,

> [f]actors to be considered in determining whether a defendant has a legitimate expectation of privacy in another person's home include: (1) possession of a key to the premises; (2) having unlimited access to the premises; (3) storing of clothing or other possessions on the premises; (4) involvement in illegal activities conducted on the premises; (5) ability to exclude other persons from the premises; and (6) expression of a subjective expectation of privacy in the premises.

*Id.* In *Govens*, for example, our Court considered these factors and concluded that the appellant had standing to challenge a warrantless search of an apartment (even though the record failed to establish whether he was a visitor, lessee, etc.), under circumstances where the appellant "was present when the police entered the apartment without a warrant[,]" "had been engaged in selling cocaine from the apartment[,]" and "apparently had dominion and control over the apartment as well as the cocaine and other evidence that was seized by police." *Id.*

¶ 11 By way of further example, in *Fields*, the United States Court of Appeals for the Second Circuit determined that the defendant, Fields, had a reasonable expectation of privacy in a residence where he had a key, could come and go as he pleased, and paid for the privilege of using the apartment, even though he did not own or lease the premises and never slept there overnight. *Fields*, 113 F.3d at 320. Similarly, the court determined that Fields' co-defendant also had a reasonable expectation of privacy in the premises, even though he did not possess a key and

"did not pay anything that could be characterized as 'rent.'" *Id.* at 321. The court determined that the co-defendant had a reasonable expectation of privacy based on the fact that he visited the apartment as Fields' guest and the circumstances were such that Fields intended to share his privacy with his co-defendant. *Id.* The court further noted that the co-defendant spent the night at the residence on one occasion and, even though he had not planned to stay overnight there at the time of the arrests, this alone did not obviate his reasonable expectation of privacy. *Id. See also United States v. Rhiger*, 315 F.3d 1283, 1286–87 (10th Cir.2003) (finding that social guest had reasonable expectation of privacy in friend's house where guest stayed overnight on three to four occasions, could enter the house in his friend's absence, and where receipts left by the guest were found in the house); *United States v. Pollard*, 215 F.3d 643, 647–48 (6th Cir.2000) (finding that defendant Pollard had reasonable expectation of privacy in home leased by friend where he occasionally spent the night, kept some personal belongings there, ate meals with the family that resided there, and was allowed to enter premises even if residents were not present); *United States v. Davis*, 932 F.2d 752, 757 (9th Cir.1991) (concluding defendant had reasonable expectation of privacy in friend's apartment where he had key to apartment, was free to come and go as he pleased, stored items in a safe there, and paid a portion of the rent).

¶ 12 On the other hand, in *Ferretti*, our Court concluded that a defendant had no reasonable expectation of privacy in his friend's apartment, where the record established that he lived with his father, had none of his clothing at the friend's apartment, did not have a key to gain entry into the apartment when his friend was not home, and had not in the past or recently stayed overnight in the apartment. *Fer-*

*retti*, 577 A.2d at 1381. Similarly, the Commonwealth cites *Gordon, Peterson*, and *In the Interest of J.J.*, 447 Pa.Super. 259, 668 A.2d 1176 (1995), for the proposition that Appellant herein does not have a reasonable expectation of privacy in the house. We will examine these cases.

¶ 13 In *Gordon*, our Supreme Court concluded the appellant had a subjective expectation of privacy in the room of an abandoned house where he hung a sheet separating the room from the rest of the house and had electricity, TV, and a mattress in the room. However, the Court concluded that the appellant's subjective expectation of privacy was not one that society was willing to recognize as legitimate. In reaching this conclusion, the Court focused on the fact that the appellant did not establish any "possessory-based factor from which we could find a reasonable expectation of privacy" such as the right to exclude others from the premises. *Gordon*, 683 A.2d at 258. The Court reasoned as follows:

> [W]e do not agree that Gordon sustained his burden of proving that the sheet served to exclude others from the dining room. Gordon did not present any testimony that he excluded other people living in the house from the dining room. Furthermore, as there was no testimony that Gordon hung the sheet himself, there was no reason ... to conclude this sheet evidenced *Gordon's* right to exclude others. Finally, Gordon's claimed exclusion of the public from the dining room is implausible because the evidence revealed that the house had an unlocked, open exterior door. Thus, Gordon failed to produce sufficient evidence that the sheet hanging in the interior doorway of the open abandoned house exhibited his right to exclude others from the room in which he was claiming a legitimate expectation of privacy.

*Id.* at 258.

¶ 14 Similarly, in *Peterson*, another case relied upon by the Commonwealth, our Supreme Court concluded that the warrantless entry by police into an abandoned storefront that was being used as a "gate house" (where drugs were being bought and sold through a hole in the door of a heavily fortified, yet abandoned, structure) did not violate the appellant's constitutional right to be free from unreasonable searches and seizures. *Peterson*, 636 A.2d at 616. Simply, the appellant failed to establish that he had an expectation of privacy in the abandoned gate house that society would be prepared to recognize as reasonable, because he made "no averment of possessory interest, legitimate presence, or indeed any factor from which a reasonable and justifiable expectation of privacy could be deduced." *Id.* at 619.

¶ 15 In the case of *In the Interest of J.J.*, also relied upon by the Commonwealth, a juvenile was suspected of selling narcotics on a street corner. Upon seeing the officer who arrived on the scene, the juvenile walked quickly up the street to a residence, opened the storm door of the residence, and dropped a clear plastic bag inside the doorway. *In the Interest of J.J.*, 668 A.2d at 1180. The officer apprehended and detained the juvenile, and retrieved the plastic bag, which contained cocaine, from the doorway. *Id.* Our court concluded that the evidence should not be suppressed because the juvenile "did not establish either that he owned the premises or that he otherwise held a legitimate and reasonable privacy interest therein." *Id.*[7]

---

**7.** Our decision against suppression was also bolstered by the facts that the juvenile voluntarily abandoned the narcotics and they were

¶ 16 The totality of the circumstances in the instant case is more akin to those found in *Govens, Fields, Rhiger, Pollard,* and *Davis,* and is distinguishable from those in *Ferretti* and the cases relied upon by the Commonwealth, *i.e., Gordon, Peterson,* and *In the Interest of J.J.* Indeed, the record in the instant case establishes that Appellant was more than a casual visitor to 3018 N. 8th Street and had an objectively reasonable expectation of privacy there. At the suppression hearing, Appellant's attorney presented the testimony of Darlene Cooper, the woman who was arrested in the house. N.T. Hearing at 13. Ms. Cooper testified that she leased the property at 3018 N. 18th Street. *Id.* at 14–15. She indicated that Appellant stayed there "[s]ometimes, not regularly, he came through and spend [sic] the night sometimes." *Id.* at 15. Her testimony continued as follows:

[Appellant's counsel]: Did [Appellant] ever have mail sent to that particular residence?

[Ms. Cooper]: Yes.

[Appellant's counsel]: On that date and time on December 16th, 2006, was [Appellant] staying with you?

[Ms. Cooper]: Not really.

[Appellant's counsel]: What do you mean not really?

[Ms. Cooper]: He would stay the weekends and he would help me out with bills and stuff.

[Appellant's counsel]: Would he pay you rent?

[Ms. Cooper]: No, he didn't pay me rent.

[Appellant's counsel]: You mention[ed] he would help you with bills, what do you mean?

[Ms. Cooper]: Like the telephone bill; sometimes the gas bill.

[Appellant's counsel]: He would give you money?

[Ms. Cooper]: Yeah, a couple dollars.

N.T. Hearing at 15. The Commonwealth then asked one question of Ms. Cooper: "Ma'am, you can't say he was staying there at the time this incident occurred, right?" *Id.* at 16. She replied, "No, I can't." *Id.* Later, upon being recalled to testify, Ms. Cooper indicated that "the boys[,] . . . come and stay the weekend" and that she cooks for them and does their laundry sometimes. *Id.* at 48.

¶ 17 Following that testimony, Appellant's counsel argued that Appellant had a reasonable expectation of privacy in the premises because, according to Ms. Cooper's testimony, Appellant stayed there sometimes and contributed to the bills. *Id.* Contrarily, the Commonwealth argued that Appellant had no expectation of privacy because, even though he stayed at the residence sometimes, he was not staying there at the time of the arrests. *Id.* at 17. Apparently, the trial court accepted the Commonwealth's argument and concluded that, because Appellant did not lease the property, was not staying there at the time of the arrests, and only gave Ms. Cooper "a few dollars on occasion to help her out[,]" Appellant did not establish a reasonable expectation of privacy in the premises. *Id.* at 17–18.

¶ 18 It is apparent from the court's remarks that it accepted the Commonwealth's argument that Appellant had to establish that he was staying on the premises as an overnight guest at the time the incident occurred in order to establish a reasonable expectation of privacy. However, we can find no Pennsylvania case that supports this proposition. Instead, it appears that in several federal cases (*e.g.,*

retrieved independent of any police miscon-

duct. *In the Interest of J.J.,* 668 A.2d at 1181.

*Fields, Rhiger,* and *Pollard* ), the court did not find this factor, *i.e.,* whether Appellant was an overnight guest at the time of the incident, to be dispositive of the issue of a reasonable expectation of privacy.[8] Even in *Ferretti,* where we determined that the defendant had no reasonable expectation of privacy, we found it relevant that the appellant had not "in the past or recently" stayed overnight on the premises, *Ferretti,* 577 A.2d at 1381, thereby giving rise to the implication that in Pennsylvania, staying overnight at the time of the search or arrests is not a dispositive factor in establishing a reasonable expectation of privacy. Rather, it is incumbent on the suppression court to consider the totality of the circumstances in each case when addressing the issue of a reasonable expectation of privacy in the searched premises.

¶ 19 We conclude that the totality of the circumstances of record in this case reveal that, although Appellant may not have been staying at the residence on the day of the arrests, he stayed overnight there on the weekends, contributed to the household bills (albeit a small amount), received mail there,[9] ate meals there, and had laundry done there on occasion. Police surveillance on the day of the incident also gives rise to the inference that Appellant had free entry into the residence as he "had been going in and out of the property the entire time of the surveillance." N.T. Hearing at 31. Certainly, Appellant was also involved in illegal activities conducted on the premises. *See Govens,* 632 A.2d at 1319. Under these circumstances, we conclude that Appellant was more than a "casual visitor" who had both a subjectively and objectively reasonable expectation of privacy in the searched premises.

¶ 20 Finding that Appellant had a reasonable expectation of privacy in the residence at 3018 N. 8th Street, we must now determine whether the warrantless entry into that residence was supported by exigent circumstances. The law of search and seizure remains focused "on the delicate balance of protecting the right of citizens to be free from unreasonable searches and seizures and protecting the safety of our citizens and police officers by allowing police to make limited intrusions on citizens while investigating crime." *Commonwealth v. Blair,* 860 A.2d 567, 571 (Pa.Super.2004). However, "[w]arrantless searches and seizures are ... unreasonable per se, unless conducted pursuant to a specifically established and well-delineated exception to the warrant requirement." *Commonwealth v. Key,* 789 A.2d 282, 287 (Pa.Super.2001). *See also Commonwealth v. Holzer,* 480 Pa. 93, 389 A.2d 101, 106 (1978) ("As a general rule, a search or seizure without a warrant is deemed unreasonable for constitutional purposes."). Furthermore:

The burden is on the Commonwealth to "present clear and convincing evidence

---

8. In fact, the defendant in *Fields,* for example, never stayed overnight at the place searched.

9. Although not presented at the suppression hearing, the arrest report in this case reveals that one Philadelphia Department of Welfare letter was recovered in the search and it bore Appellant's name with the address of the premises at 3018 N. 8th Street. Appellant's ID card was also found in the living room of the premises. Although Appellant complains that the Commonwealth failed to mention these items to the suppression court, we re-

mind Appellant that it was his burden to establish a reasonable expectation of privacy in the premises. *See Commonwealth v. Arnold,* 932 A.2d 143, 153 (Pa.Super.2007) (stating that the defendant seeking suppression carries the "the initial burden of showing that [he] had a personal right of privacy in the place to be searched or the items seized" and "[o]nly if the defendant carries this initial burden does the burden then shift to the Commonwealth to prove that the evidence was properly seized").

that the circumstances surrounding the opportunity to search were truly exigent ... and that the exigency was in no way attributable to the decision by the police to forego seeking a warrant." Moreover, "[a]ll decisions made pursuant to the exigent circumstances exception must be made cautiously, for it is an exception which by its nature can very easily swallow the rule unless applied in only restricted circumstances."

*Commonwealth v. English,* 839 A.2d 1136, 1141 (Pa.Super.2003) (quoting *Commonwealth v. Weik,* 360 Pa.Super. 560, 521 A.2d 44, 47 (1987) (citations omitted)).

¶ 21 As our Supreme Court explained:

In a private home, searches and seizures without a warrant are presumptively unreasonable[.] Absent probable cause and exigent circumstances, the entry of a home without a warrant is prohibited under the Fourth Amendment. In determining whether exigent circumstances exist, a number of factors are to be considered[:] (1) the gravity of the offense, (2) whether the suspect is reasonably believed to be armed, (3) whether there is above and beyond a clear showing of probable cause, (4) whether there is strong reason to believe that the suspect is within the premises being entered, (5) whether there is a likelihood that the suspect will escape if not swiftly apprehended, (6) whether the entry was made peaceably, and (7) the time of the entry, i.e., whether it was made at night. These factors are to be balanced against one another in determining whether the warrantless intrusion was justified. Other factors may also be taken into account, such as whether there is hot pursuit of a fleeing felon, a likelihood that evidence will be destroyed if police take time to obtain a warrant, or danger to police or other persons inside or out-

side the dwelling. Nevertheless, police bear a heavy burden when attempting to demonstrate an urgent need that might justify warrantless searches or arrests.

*Arnold,* 932 A.2d at 146 (quoting *Commonwealth v. Roland,* 535 Pa. 595, 637 A.2d 269, 270–71 (1994)).

¶ 22 Appellant was arrested a distance of approximately one-half block, or four or five houses away, from the house at 3018 N. 8th Street. N.T. Hearing at 30. Thus, most of the factors enumerated above (*i.e.,* whether the suspect is armed, in the residence, will likely flee, etc.) obviously do not apply to establish an exigency. However, as also noted in *Arnold,* other factors may justify a warrantless entry such as "a likelihood that evidence will be destroyed if police take time to obtain a warrant." *Id.*

¶ 23 In this regard, Officer Stewart explained that the officer who had been conducting surveillance, Officer Perez, told Officer Stewart that Appellant was their target individual, as he was observed selling drugs, and that he had "been going in and out of the property the entire time of the surveillance." N.T. Hearing at 31. After Appellant's arrest, Officer Stewart and Officer Campbell approached the house. *Id.* at 32. Although it was not clear what she meant by "approached," on cross examination at the suppression hearing Appellant's counsel asked Officer Stewart: "What was the point of going to the house?" *Id.* at 32. Officer Stewart clarified the circumstances as follows:

We were standing outside. We weren't going into the house. We were standing outside and there was a group of us. We were still receiving information from the surveillance officer. We were discussing things over with our lieutenant, and then [Jerome] Sanders came out and opened the door to this property which I can only assume that he knew it

was the target property at that point, but I don't recall when he let us know. *Id.* at 32. She also stated that "[b]efore Mr. Sanders opened the door we knew that that was the [target] property, but we had no intentions to go into that property at that point until Mr. Sanders opened the door" because they did not have a search warrant. *Id.* at 34.

¶ 24 When Mr. Sanders unexpectedly, and without any prompting by police, opened the door at the target property, 3018 N. 8th Street, he became aware that police were outside. Combined with the fact that he said "oh shit" when he saw the police and made furtive movements behind the door as if he were tossing objects to conceal them, along with the probability gained from surveillance that the house contained a stash of drugs, police could reasonably conclude that an exigency arose with regard to the possibility that Mr. Sanders and/or other persons inside the residence would destroy incriminating evidence. *See Commonwealth v. Walker,* 836 A.2d 978 (Pa.Super.2003) (concluding exigency of potential destruction of evidence justified warrantless entry into defendant's motel room where the defendant, who was outside of his room holding a crack pipe when the officer arrived on the scene, made eye contact with the officer, quickly turned, and reentered his room, giving rise to reasonable conclusion on part of the officer that defendant would attempt to dispose of drugs, as the defendant was now aware of the officer's presence through no fault of the officer). *Cf. Commonwealth v. Demshock,* 854 A.2d 553, 557 (Pa.Super.2004) (noting that police cannot create their own exigencies to justify a warrantless entry, and concluding that where the police "observed the illegal activity [*i.e.,* suspected underage drinking] from outside the premises without the occupants detecting their presence" and

could have likely secured the search warrant prior to anyone inside the apartment realizing that the police were outside, the warrantless entry precipitated by police knocking on apartment door was not supported by exigent circumstances); *English,* 839 A.2d at 1142 (concluding warrantless seizure of marijuana plants not justified, even though police claimed plants could be destroyed before search warrant could be procured, where officers, *inter alia,* believed no one was home at the time, exhibited no concerns with regard to potential destruction of evidence, and could have secured the scene while a different officer obtained a warrant).

¶ 25 Finding that the warrantless entry was justified under these circumstances, we now turn to Appellant's contention that the police exceeded their authority by conducting an illegal search upon their warrantless entry into the residence, as opposed to conducting a legitimate protective sweep. According to Appellant, and as supported by the testimony of Ms. Cooper at the suppression hearing, upon making their initial warrantless entry, the officers "breached the home in force[,]" "[p]eople were cuffed and exposed to displays of police authority and abusive language[,]" and "[p]olice secured the people downstairs and began searching through mail and in the kitchen." Appellant's brief at 23. *See also* N.T. Hearing at 42–44 (where Ms. Cooper explains that police swarmed the house, told everyone to "[g]et the fuck down[,]" arrested individuals in the house, and searched through "papers and stuff").

¶ 26 On the other hand, Officer Stewart explained that, after Officer Campbell entered the vestibule and arrested Mr. Sanders, other officers entered the house and noticed that another individual therein, John Boyd, was exiting a middle bedroom on the second floor. N.T. Hearing at 28–29.

Officer Stewart went to the second floor, placed Mr. Boyd in handcuffs to secure him, and, by looking through the doorway into the bedroom, she could see, in "plain view on a table directly inside the middle bedroom on the second floor[,] seven bundles of clear heat-sealed packets each containing white glassine packets stamped 'Class the Best' of alleged heroin or fetinol [sic]." *Id.* at 29, 37. These items were recovered after the search warrant was obtained. *Id.* at 29. Officer Stewart testified that officers did not conduct a search of the premises until the search warrant arrived. *Id.* at 36. She indicated that they "did a walk-through" which included "open[ing] and clos[ing] doors to make sure nobody is in there hiding" and "[o]pening basement door [sic] to make sure nobody was in the basement." *Id.* at 36–37. She also denied searching through any papers. *Id.* at 37.

¶ 27 The trial court was entitled to believe Officer Stewart's account of these events,[10] which support the trial court's conclusion that officers conducted a legitimate protective sweep to secure the premises and persons therein after properly entering the premises under exigent circumstances that arose when it became likely that evidence would be destroyed after Mr. Sanders opened the door and became aware of police presence. *See Commonwealth v. Taylor*, 565 Pa. 140, 771 A.2d 1261, 1267 (2001) (citation omitted) ("A protective sweep is 'a quick and limit-

ed search of premises, incident to an arrest and conducted to protect the safety of police officers or others.'"); *Commonwealth v. Gillespie*, 573 Pa. 100, 821 A.2d 1221, 1227 n. 2 (2003) (quoting *Segura v. United States*, 468 U.S. 796, 810, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984)) ("[S]ecuring a dwelling, on the basis of probable cause, to prevent the destruction or removal of evidence while a search warrant is being sought is not itself an unreasonable seizure of either the dwelling or its contents.").[11]

¶ 28 Accordingly, even though the trial court erred in its legal conclusions that Appellant did not have standing and did not establish a reasonable expectation of privacy, we conclude that the trial court did not err in finding an exigency regarding the potential destruction of evidence and in finding that the police conducted a legitimate protective sweep to secure the premises and the people therein. Thus, the trial court properly denied Appellant's motion to suppress. *See Wachovia Bank, N.A. v. Ferretti*, 935 A.2d 565, 575 (Pa.Super.2007) ("[W]e may affirm the trial court's decision on an alternate basis.").

¶ 29 In his second issue, Appellant contends that "there was insufficient evidence from which to reasonably conclude that the Appellant was engaged in a conspiratorial relationship or that he had dominion and control over the stash found inside of the house." Appellant's brief at 28.

---

10. "The suppression court's findings of fact bind an appellate court if the record supports those findings." *Commonwealth v. Copeland*, 955 A.2d 396, 399 (Pa.Super.2008) (citation omitted).

11. We further note that Appellant failed to develop argument pertaining to his contention that information gleaned during the warrantless entry and protective sweep improperly served as a basis for probable cause underlying the search warrant. Neverthe-

less, we disagree with Appellant's contention, and we direct Appellant to the record of the suppression hearing, where the trial court rejected Appellant's "four-corners" challenge to the warrant, concluding that the affidavit of probable cause underlying the warrant contained no information gleaned following the warrantless entry into the residence. Appellant provides this Court with nothing upon which to conclude otherwise.

The standard we apply when reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced is free to believe all, part or none of the evidence. Furthermore, when reviewing a sufficiency claim, our Court is required to give the prosecution the benefit of all reasonable inferences to be drawn from the evidence.

However, the inferences must flow from facts and circumstances proven in the record, and must be of such volume and quality as to overcome the presumption of innocence and satisfy the jury of an accused's guilt beyond a reasonable doubt. The trier of fact cannot base a conviction on conjecture and speculation and a verdict which is premised on suspicion will fail even under the limited scrutiny of appellate review.

*Commonwealth v. Smith*, 956 A.2d 1029, 1035–36 (Pa.Super.2008) (*en banc*) (citations omitted).

When reviewing a challenge to the sufficiency of the evidence with regards to a PWID conviction, we are mindful that

[t]he Commonwealth must prove both the possession of the controlled substance and the intent to deliver the controlled substance. It is well settled that all the facts and circumstances surrounding possession are relevant in making a determination of whether contraband was possessed with intent to deliver.

In Pennsylvania, the intent to deliver may be inferred from possession of a large quantity of controlled substance. It follows that possession of a small amount of a controlled substance supports the conclusion that there is an absence of intent to deliver.

Notably, "if, when considering only the quantity of a controlled substance, it is not clear whether the substance is being used for personal consumption or distribution, it then becomes necessary to analyze other factors."

*Commonwealth v. Lee*, 956 A.2d 1024, 1028 (Pa.Super.2008) (citations omitted). "To sustain a conviction for Criminal Conspiracy, the Commonwealth must prove beyond a reasonable doubt that the defendant (1) entered into an agreement to commit or aid in an a criminal act with another person or persons (2) with a shared criminal intent and that (3) an overt act was done in furtherance of the conspiracy." *Commonwealth v. Johnson*, 920 A.2d 873, 878 (Pa.Super.2007).

¶ 30 We adopt the reasoning of the trial court, set forth as follows, which explains how the evidence was sufficient to sustain both the convictions for PWID and

conspiracy. First, with regard to PWID, the court stated:

As detailed above, surveillance officers saw [Appellant] making two separate transactions with buyers who were, thereafter, stopped in possession of packets of heroin/fentanyl stamped "Class the best" and "High class the best." Before and after each transaction, [Appellant] would go in and out of the house at 3018 N. 8th Street, and he twice placed items in a nearby car. At the time officers ordered [Appellant's] arrest, he was surrounded by people attempting to give him money, and, upon seeing police, he attempted to flee. In addition to the fact that officers recovered a large amount of cash from both [Appellant] and the car he had been frequenting, officers recovered, from the property, large amounts of drug dealing paraphernalia and a wide variety of drugs, which included packets of heroin/fentanyl stamped "Class the best." Furthermore, a narcotics expert testified that, in his opinion, the drugs in the house were possessed with the intent to deliver.

T.C.O. at 7. With regard to conspiracy, the court stated:

As detailed above, the evidence established that when [Appellant] first exited 3018 N. 8th Street, he approached an unknown male on the corner and handed him small objects. This male had already engaged in an observed drug transaction with a buyer who was stopped in possession of packets of heroin/fentanyl stamped "High class the best." [Appellant] then stood next to this unknown male while [Appellant] engaged in two separate transactions with buyers who were, similarly, stopped in possession of packets of heroin/fentanyl stamped "Class the best" and "High class the best." The bundled heroin/fen-

tanyl recovered from the house was also stamped "Class the best," and another male—John Boyd—was arrested in the house after an officer saw him leaving the room where packets of this mixture were bundled in plain view.

*Id.* at 8. Based on the above reasoning, which is supported by the trial record, we conclude that Appellant's challenge to the sufficiency of the evidence is without merit.

¶ 31 Judgment of sentence affirmed.