J-S63003-15

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellee | : | |
| | : | |
| v. | : | |
| | : | |
| NATHAN BULLMAN, | : | |
| | : | |
| Appellant | : | No. 3338 EDA 2014 |

Appeal from the Judgment of Sentence October 1, 2014,
Court of Common Pleas, Delaware County,
Criminal Division at No. CP-23-CR-0000136-2014

BEFORE: DONOHUE, MUNDY and MUSMANNO, JJ.

MEMORANDUM BY DONOHUE, J.: **FILED NOVEMBER 04, 2015**

Nathan Bullman ("Bullman") appeals from the judgment of sentence entered following his convictions of robbery, possession of an instrument of crime, persons not to possess firearms, and firearms not to be carried without a license.[1] Bullman challenges the trial court's denial of his motion to suppress and the sufficiency of the evidence supporting his convictions. We affirm.

The facts, as found by the trial court, are as follows:

> The [v]ictim in this case, Eric Taylor, drives a cab for the Crown Cab Company. At about 1:55 a.m. on October 31, 2013 he received a dispatch concerning a possible fare. Information regarding the fare is transmitted to a computer located in the cab through an automated system. Mr. Taylor received the name and location of the customer and accepted the fare. N.T. 6/26/14 pp. 12-15, 34-37. Mr. Taylor

---

[1] 18 Pa.C.S.A. §§ 3701, 907,6105, 6106.

testified that the name transmitted to him was possibly "Bowman" and that he was directed to the vicinity of a Seven-Eleven store near a bar on Baltimore Avenue for the pick -up. *Id.* at 34 -37. Mr. Taylor pulled into the Seven-Eleven store parking lot and saw [Bullman] waiting, wearing a black hoodie. [Bullman] indicated to Mr. Taylor that he was waiting for his girlfriend but then walked over to the cab alone. In the lighted parking lot he looked through the cab's passenger side window at Mr. Taylor and told him that he wanted to go to 162 Melrose Avenue. *Id.* at 16 -17, 39. [Bullman] entered the rear of the cab and Mr. Taylor drove to Melrose Avenue. The trip took about eight minutes. *Id.* at 41 -42.

Melrose Avenue is a dead-end street. On Melrose[,] [Bullman] directed Mr. Taylor past 162 Melrose Avenue to the far end of the street and told him to pull over. Mr. Taylor complied. *Id.* at 19, 41- 42. The driver's area of the cab is not protected from the rear passenger compartment by a divider of any kind. *Id.* at 22. [Bullman] attempted to pay his fare with a credit card by "swiping" the card through a card reader located in the rear passenger compartment. Mr. Taylor told [Bullman] that the card reader was broken and that he (Mr. Taylor) would have to use another card reader In the front seat. [Bullman] responded in a hostile manner and refused to give Mr. Taylor the card. *Id.* at 19 -20, 49 -51. [Bullman] then pulled a black and chrome firearm from his right side and pointed the gun at Mr. Taylor's upper chest and face and said, "you know what man? You know what? Just give me your dough." *Id.* at 21 -22.

Mr. Taylor reached into his pocket and took out all of the money he had: about seventy dollars. He threw the cash at [Bullman], got out of the cab and ran, leaving his cell phone and his hoodie in the vehicle. He ran about a half a mile to Baltimore Avenue looking for a telephone. Finally, he found an occupied shop and reported the robbery to police.

*Id.* at 24 -25, 53. A responding police officer took him back to Melrose Avenue where the cab was at rest and unoccupied about a block away from where Mr. Taylor left it. *Id.* at 26, 55. Mr. Taylor's cell phone and hoodie were still in the vehicle. *Id.* at 55.

Officer John Meehan of the East Lansdowne Police Department was patrolling the vicinity of Melrose Avenue when he came upon the cab. It was unoccupied, west of Melrose Avenue on Glenwood Avenue at the side of the road. It was over the on [sic] the grassy berm. *Id.* at 63-64. The car was running, the lights were on and the rear door was open. *Id.* at 64. Officer Meehan reported the cab to DELCOM and was informed that there was a robbery reported in the area and that the victim was a half mile away. Officer Meehan called the Crown Cab Company and interviewed Mr. Taylor after he arrived back at the scene. *Id.* at 64- 65. Mr. Taylor told the officer about the robbery and described his passenger as a white male, six feet tall, in his 30's, with a medium build and wearing a black hoodie and blue jeans. *Id.* at 66. From his investigation Officer Meehan learned that the man who called for the cab was named "Nate." *Id.* at 102.

At about 7:00 a.m. Officer Meehan went to 162 Melrose Avenue. This is a three unit apartment building that was formerly a single family dwelling. Officer Meehan was familiar with the building and with its residents through prior police contacts. He knew that the front units were occupied by a family and a couple in their fifties and that William Slaughter lives in the rear unit. *Id.* at 70-72. Officer Meehan knocked on the door and Mr. Slaughter answered. He asked if Mr. Slaughter had visitors and he replied that he did. *Id.* Officer Meehan asked Mr. Slaughter if he and his partner could come in and Mr. Slaughter consented. *Id.* at 72.

This rear apartment does not have "designated rooms." The room that is entered from the outer door had a bed in it and Officer Meehan could see a

white male, [Bullman], and a white female under covers in a bed before he entered the apartment. *Id.* at 72-73. The bed consisted of either two mattresses or a mattress and a box spring stacked on the floor. *Id.* at 74. The occupants of the bed woke. [Bullman] matched the description that Mr. Taylor had provided and when Officer Meehan asked him for his name, [Bullman] replied, "Nate." Officer Meehan asked the couple to show their hands and themselves and they both stood up. *Id.* at 74. Before allowing the couple to sit back down on the bed he conducted a sweep of the bed and found a black semi-automatic handgun and two crack pipes between the mattresses, about ten inches in from the edge. *Id.* at 75. All three occupants were immediately detained and the firearm was secured. Officer Meehan found that there was a live round in the chamber of the firearm and the magazine contained five additional rounds. *Id.* at 76-79.

At the police station after his arrest [Bullman] was orally advised of his Miranda rights. *Id.* at 80-83, 110-13. He waived his rights and told Officer Meehan that he was a passenger in Mr. Taylor's cab, that he was picked up at the Seven-Eleven, and that he wanted to use his credit card to pay the fare but that the driver wanted cash. *Id.* at 84. When he explained that he had no cash, the driver said that he could leave without paying and he did. He did not have a gun with him in the cab. *Id.* at 84 -85, 114.

Trial Court Opinion, 3/24/15, at 4-6.

Bullman filed three motions to suppress.[2] Following a hearing, the trial court granted only Bullman's motion to suppress identifications and denied the other motions. The parties immediately proceeded to a bench trial. The trial court then convicted Bullman of the above-stated offenses and later

---

[2] ***See*** Motion to Suppress Physical Evidence, 4/28/14; Motion to Suppress Statements, 4/28/14; Motion to Suppress Identifications, 5/12/14.

sentenced him to an aggregate term of six to twelve years of incarceration, following by six years of probation. The trial court denied Bullman's post-sentence motions, and this timely appeal followed.

Bullman presents six issues for our review:

1. Whether the [t]rial [c]ourt erred in denying [Bullman's] [m]otion to [s]uppress [p]hysical [e]vidence because the evidence was insufficient to establish that Mr. Slaughter had the requisite authority, actual or apparent, to give consent to Officer Meehan's otherwise illegal and warrantless entry into the apartment?

2. Whether the [t]rial [c]ourt erred in denying [Bullman's] [m]otion to [s]uppress [p]hysical [e]vidence because the evidence was insufficient to establish that Mr. Slaughter had the requisite authority, actual or apparent, to give consent to Officer Meehan's otherwise illegal and warrantless entry into the bedroom occupied by Bullman?

3. Whether the [t]rial [c]ourt erred in denying [Bullman's] [m]otion to [s]uppress [p]hysical [e]vidence because the evidence was insufficient to establish that Mr. Slaughter had the requisite authority, actual or apparent, to give consent to Officer Meehan's otherwise illegal and warrantless search under the mattress?

4. Whether the [t]rial [c]ourt erred in denying [Bullman's] [m]otion to [s]uppress [p]hysical [e]vidence recovered from under the mattress because at this time, Officer Meehan detained [Bullman] when he ordered him out of the bed and the facts known and articulated by Officer Meehan were insufficient to support reasonable suspicion justifying the search?

5. Whether the evidence presented at the non[-]ury trial was insufficient to support the verdict of guilty

on [p]ossession of [f]irearm [p]rohibited because the Commonwealth failed to prove identity beyond a reasonable doubt?

6. Whether the evidence presented at the non-jury trial was insufficient to support the verdict of guilty on [r]obbery because the Commonwealth failed to prove identity and whether [Bullman] threatened the victim or put the victim in fear of immediate serious bodily injury beyond a reasonable doubt?

Bullman's Brief at 9-10. The first four of these issues challenge the trial court's denial of his motion to suppress the physical evidence recovered from Mr. Slaughter's apartment. We need not consider the particulars of these claims. Because Bullman failed to establish an expectation of privacy in the apartment, his suppression motion could not succeed.[3]

"Generally, to have standing to pursue a suppression motion under Pa.R.Crim.P. 581, the defendant's own constitutional rights must have been

---

[3]

> Our standard of review in addressing a challenge to the denial of a suppression motion is limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, we are bound by these findings and may reverse only if the court's legal conclusions are erroneous.

*Commonwealth v. Jones*, 988 A.2d 649, 654 (Pa. 2010).

- 6 -

infringed. However, it is well settled that a defendant charged with a possessory offense in this Commonwealth has 'automatic standing' because the charge itself alleges an interest sufficient to support a claim under Article I, § 8 [of the Pennsylvania Constitution]." ***Commonwealth v. Enimpah***, 106 A.3d 695, 698 (Pa. 2014) (citation omitted). Bullman was charged with a possessory offense, and so he has automatic standing to seek suppression of the items seized from Slaughter's apartment. "In addition to standing, though, a defendant must show that he had a privacy interest in the place invaded or thing seized that society is prepared to recognize as reasonable." ***Id. See also Commonwealth v. Millner***, 888 A.2d 680, 692 (Pa. 2005) ("[A] defendant cannot prevail upon a suppression motion unless he demonstrates that the challenged police conduct violated his own, personal privacy interests.").

> [F]actors to be considered in determining whether a defendant has a legitimate expectation of privacy in another person's home include: (1) possession of a key to the premises; (2) having unlimited access to the premises; (3) storing of clothing or other possessions on the premises; (4) involvement in illegal activities conducted on the premises; (5) ability to exclude other persons from the premises; and (6) expression of a subjective expectation of privacy in the premises.

***Commonwealth v. Bostick***, 958 A.2d 543, 553 (Pa. Super. 2008) (quoting ***Commonwealth v. Govens***, 632 A.2d 1316, 1319 (Pa. Super. 1993)).

"Whether a defendant has a legitimate expectation of privacy is a component of the merits analysis of the suppression motion ... made upon evaluation of the evidence presented by the Commonwealth and the defendant." *Enimpah*, 106 A.3d at 699 (quoting *Commonwealth v. Burton*, 973 A.2d 428, 435 (Pa. Super. 2009) (en banc)). The record contains absolutely no evidence that would support a finding of any of these factors in Bullman's favor. Furthermore, Bullman presented no evidence at all, much less any that would support a finding of any of these factors. "To be sure, under our jurisprudence, the defendant bears the burden of persuasion with respect to his privacy interest." *Id.* at 701. Bullman has failed in this regard, as he did not present any evidence that would support a finding of any of the six *Bostick* factors or other indicia that he had a privacy interest in Mr. Slaughter's apartment. For that reason, we find no error in the trial court's determination that Bullman did not establish a privacy interest in the apartment in which the search occurred, *see* Trial Court Opinion, 3/24/15, at 13 n.6, and therefore we affirm the trial court's denial of his suppression motion.[4]

Bullman's remaining issues challenge the sufficiency of the evidence underlying his convictions of robbery and persons not to possess firearms. We review these issues mindful that

---

[4] We note Bullman's contention that the Commonwealth did not raise his failure to establish a privacy interest in the trial court, but he is mistaken. *See* N.T., 6/26/14, at 127.

> [w]hen evaluating a sufficiency claim, our standard is whether, viewing all the evidence and reasonable inferences in the light most favorable to the Commonwealth, the fact[-]finder reasonably could have determined that each element of the crime was established beyond a reasonable doubt. This Court considers all the evidence admitted, without regard to any claim that some of the evidence was wrongly allowed. We do not weigh the evidence or make credibility determinations. Moreover, any doubts concerning a defendant's guilt were to be resolved by the fact[-]finder unless the evidence was so weak and inconclusive that no probability of fact could be drawn from that evidence.

*Commonwealth v. Kane*, 10 A.3d 327, 332 (Pa. Super. 2010).

With regard to both convictions, Bullman argues only that the Commonwealth failed to establish that he was the person that robbed the cab driver, Mr. Taylor, with a firearm. Bullman's Brief at 29-34. However, in making this argument, Bullman challenges the trial court's credibility determinations by pointing to inconsistencies in Mr. Taylor's testimony and his past *crimen falsi* conviction, as well as fact that prior to any court proceeding, he only identified Bullman as the assailant in a photo array (the suppression of which the parties agreed upon) and not in person. *Id.* at 31-32. The credibility of the witness is addressed to the weight of the evidence, not the sufficiency of the evidence. *Commonwealth v. Gibbs*, 981 A.2d 274, 281 (Pa. Super. 2009). Bullman did not include a challenge to the weight of the evidence in his statement of questions involved, and so it is waived. *Commonwealth v. Bryant*, 57 A.3d 191, 196 n.7 (Pa. Super.

- 9 -

2012) (finding issues waived where appellant did not include them in statement of questions involved); Pa.R.A.P. 2116(a) ("No question will be considered unless it is stated in the statement of questions involved or is fairly suggested thereby."). Furthermore, Bullman did not include a challenge to the weight of the evidence in his Pa.R.A.P. 1925(b) statement of matters complained of on appeal. It is well established that failure to include an issue in a Rule 1925(b) statement results in waiver of that issue on appeal. *Commonwealth v. Garland*, 63 A.3d 339, 342 (Pa. Super. 2013); Pa.R.A.P. 1925(b)(4)(vii). Bullman's weight challenge is waived for this reason, as well.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/4/2015