J. S90041-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA,   :   IN THE SUPERIOR COURT OF
  :   PENNSYLVANIA
           Appellee   :
     v.   :
  :
JORGE LUIS ARROYO-O'NEILL,   :
  :
          Appellant   :   1090 EDA 2016

Appeal from the Judgment of Sentence February 18, 2016
In the Court of Common Pleas of Pike County
Criminal Division at No(s): CP-52-CR-0000415-2014

COMMONWEALTH OF PENNSYLVANIA,   :   IN THE SUPERIOR COURT OF
  :   PENNSYLVANIA
           Appellant   :
     v.   :
  :
JORGE LUIS ARROYO-O'NEILL,   :
  :
          Appellee   :   1161 EDA 2016

Appeal from the Judgment of Sentence February 18, 2016
In the Court of Common Pleas of Pike County
Criminal Division at No(s): CP-52-CR-0000415-2014

BEFORE: OTT, J., SOLANO, J. AND JENKINS, J.

MEMORANDUM BY OTT, J.:            **FILED FEBRUARY 10, 2017**

Jorge Luis Arroyo-O'Neill appeals from the judgment of sentence imposed on February 18, 2016, in the Court of Common Pleas of Pike County. A jury convicted Arroyo-O'Neill of possession of a controlled substance, possession with intent to deliver a controlled substance ("PWID"), possession of a small amount of marijuana, possession of drug

- 1 -

paraphernalia, fleeing or eluding a police officer ("fleeing or eluding"), and driving under the influence ("DUI").[1]  The jury found that Arroyo-O'Neill possessed with the intent to deliver 27.01 grams of heroin, 73.19 grams of cocaine and 14.31 grams of cocaine.  In finding Arroyo-O'Neill guilty of fleeing or eluding, the jury specifically found that Arroyo-O'Neill endangered a law enforcement officer or member of the general public by engaging in a high speed chase.[2]  The trial court sentenced Arroyo-O'Neill to an aggregate term of 8½ to 20 years' imprisonment and ruled that he was eligible for a Recidivism Risk Reduction Incentive ("RRRI") minimum sentence of 84 months and 20 days.  The trial court denied Arroyo-O'Neill's and the Commonwealth's post-sentence motions, and both Arroyo-O'Neill and the Commonwealth filed timely appeals that we have consolidated as cross-appeals.  Both parties and the trial court complied with Pa.R.A.P. 1925.

Based upon the reasons discussed below, we affirm Arroyo-O'Neill's judgment of sentence in part, and vacate in part. The judgment of sentence of 8½ to 20 years' imprisonment is affirmed, and the RRRI minimum sentence of 84 months and 20 days is vacated.

---

[1] 35 P.S. § 780-113(a)(16), (30), (31), (32), 75 Pa.C.S. §§ 3733(a), and 75 Pa.C.S. § 3802(a)(1), respectively.

[2] **See** 75 Pa.C.S. § 3733(a.2)(2)(iii) (high speed chase graded as a third degree felony).  With respect to fleeing and eluding, the jury also found Arroyo-O'Neill committed a violation of Section 3802 of the Pennsylvania Motor Vehicle Code (relating to driving under the influence of alcohol) during the commission of the offense.  **See** 75 Pa.C.S. § 3733(a.2)(2)(i) (violation of Section 3802 graded as a third degree felony).

**APPEAL OF ARROYO O'NEILL**
**1090 EDA 2016**

Arroyo-O'Neill raises eight issues in his direct appeal, which we re-order for purposes of disposition:

1. Whether the evidence was insufficient to establish [Arroyo-O'Neill's] conviction of [PWID][?]

2. Whether the evidence was insufficient to establish [Arroyo-O'Neill's] conviction of [DUI][?]

3. Whether the verdict was against the weight of the evidence because the evidence did not establish [Arroyo-O'Neill's] conviction of [PWID][?]

4. Whether the verdict was against the weight of the evidence because the evidence did not establish [Arroyo-O'Neill's] conviction of [DUI][?]

5. Whether the [t]rial [c]ourt erred and abused its discretion by denying [Arroyo-O'Neill's] Motion to Suppress Evidence because the traffic stop initiated by the Pennsylvania State Police was illegal[?]

6. Whether the [t]rial [c]ourt erred and abused its discretion by denying [Arroyo-O'Neill's] [m]otion *in limine* requesting the preclusion of [Arroyo-O'Neill's] medical records from Wayne Memorial Hospital because said records were hearsay evidence[?]

7. Whether the [t]rial [c]ourt erred and abused its discretion in admitting into evidence [Arroyo-O'Neill's] medical records from Wayne Memorial Hospital[?]

8. Whether the [t]rial [c]ourt erred and abused its discretion by running [Arroyo-O'Neill's] sentence consecutive to [Arroyo-O'Neill's] sentence from Lackawanna County, Pennsylvania because the Lackawanna County Sentencing Order indicated the Pike County, Pennsylvania sentence was concurrent to the Lackawanna County sentence[?]

Arroyo-O'Neill's Brief at 9-10.

In his first two arguments, which we review together, Arroyo-O'Neill challenges the sufficiency of the evidence underlying his convictions for PWID and DUI. When examining a challenge to the sufficiency of evidence, our standard of review is as follows:

> The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying [the above] test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the [trier] of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Hansley*, 24 A.3d 410, 416 (Pa. Super. 2011).

The trial court accurately summarized the evidence adduced during trial as follows:

> Two Pennsylvania State Police Troopers testified to the following. On June 29, 2014, at approximately 2:15 a.m., Troopers

[Jeremy] Carroll[3] and [Mark] Pajalich [who were state troopers for nine and sixteen years, respectively,] were patrolling State Route 739 in Lords Valley, Pike County in a marked state police patrol car equipped with overhead LED lights and Mobile Video Recording Camera ("MVR"), which starts recording video about fifteen seconds prior to activation of the overhead lights. The [t]roopers were stopped in the southbound lane at a temporary red light when [Arroyo-O'Neill's] vehicle approached and drove past them in the northbound lane. After observing the vehicle cross the double yellow line[1] into the southbound lane while still heading northbound, the [t]roopers said to each other that the driver must be drunk and initiated a U-turn to pursue the vehicle. The [t]roopers fully caught up to the vehicle about half a mile away after observing it touch/partially cross the fog line multiple times, giving further indication of impaired driving.[2] Upon catching up to the vehicle, the [t]roopers activated the overhead lights. At that point, the vehicle signaled for a left turn onto the onramp for Interstate 84 westbound and, while making the turn, crossed fully over the fog line. While on the onramp, the vehicle signaled four times as if to pull over, slowed, started to pull over, and then accelerated away from the [t]roopers. The vehicle then entered Interstate 84 westbound, at which point Trooper Pajalich executed a non-deadly PIT maneuver, causing the vehicle to spin and stop. The [t]roopers exited the patrol car and approached the vehicle, at least one having drawn his gun and shouting to exit the vehicle. The vehicle then accelerated eastbound on the westbound lane, despite the [t]roopers ordering it to stop, and drove the wrong direction on the onramp back to Route 739. The [t]roopers reentered the patrol car and pursued the vehicle on Route 739. It appears that there were no other vehicles around [Arroyo-O'Neill's] vehicle during the incident. After speeding and crossing the center line, the vehicle eventually stopped on Route 739, and the driver, identified as [Arroyo-O'Neill], ran into the woods.

_____

[1] Trooper Carroll testified to seeing the vehicle cross the line once, while Trooper Pajalich testified to seeing it cross the line twice from the side-view mirror.

_____

[3] We have corrected the spelling of Trooper Carroll's name to the spelling that appears in the record.

_____

Trooper Pajalich stayed with the vehicles to detain the compliant passenger, while Trooper Carroll pursued [Arroyo-O'Neill]. Despite orders to stop, [Arroyo-O'Neill] continued running. Trooper Carroll then deployed his Taser, which stunned [Arroyo-O'Neill] for five seconds and brought him down. Trooper Carroll also fell into a ditch with [Arroyo-O'Neill] at this point. Trooper Carroll attempted to handcuff [Arroyo-O'Neill], but [Arroyo-O'Neill] turned and grabbed the Taser. Trooper Carroll attempted to [T]aser [Arroyo-O'Neill] a second time, but [Arroyo-O'Neill] had apparently dislodged the probes. Trooper Carroll then tried to use the front of the Taser to stun [Arroyo-O'Neill], but [Arroyo-O'Neill] slapped the Taser out of his hand. Trooper Carroll and [Arroyo-O'Neill] then fell in the ditch and struggled, and [Arroyo-O'Neill] broke free and ran. Trooper Carroll pursued him, ordering him to stop, and sprayed him in the back with mace, but [Arroyo-O'Neill] did not stop.

Trooper Pajalich then arrived in the woods, [T]asered [Arroyo-O'Neill], and assisted with handcuffing him. Trooper Pajalich testified that while handcuffing [Arroyo-O'Neill], [Arroyo-O'Neill] was uncooperative and resistant and fighting them. [Arroyo-O'Neill] would not stand and walk, so both [t]roopers had to drag him out of the woods. When they brought him out of the woods, both [t]roopers, having been trained and experienced in field sobriety testing and detecting driver impairment, observed that [Arroyo-O'Neill] appeared to be under the influence of alcohol. The [t]roopers observed that [Arroyo-O'Neill] had an odor of alcohol, bloodshot, watery eyes, and slurred speech and determined that he was not able to safely operate a motor vehicle. They also found a cup with alcohol in the car's console, and Trooper Pajalich testified that he heard [Arroyo-O'Neill] admit to hospital staff that he had been drinking. Trooper Carroll testified that they did not conduct field sobriety tests because [Arroyo-O'Neill] had been combative, physical, and running. In addition, both [t]roopers admitted that the pepper spray/mace that was used can cause watery, red eyes.

For safety purposes, Trooper Carroll then patted [Arroyo-O'Neill] down lightly for weapons, consisting of a frisk of the pockets (for safety reasons, without entering the pockets), front and back waistline, crotch area, and ankles. Trooper Carroll detected in the cargo shorts what felt like balled up socks but, upon removal, appeared to be cocaine, crack cocaine, and marijuana-- there were four sandwich bags total that he placed first on the ground and then on the hood of the patrol car. Both [t]roopers stated that they had never encountered that amount of drugs. Trooper Carroll also found two cell phones and a wallet on [Arroyo-O'Neill] while on the roadside.

At the roadside, [Arroyo-O'Neill] was complaining of a back injury, so the [t]roopers called in an ambulance, which took [Arroyo-O'Neill] to Wayne Memorial Hospital. Trooper Pajalich accompanied [Arroyo-O'Neill] to the hospital, and, while there, found $3,630.30 in cash in multiple denominations in [Arroyo-O'Neill's] shorts. Additionally, because [Arroyo-O'Neill] had refused to submit to a police requested blood test, Trooper Carroll obtained via a search warrant his medical records from the hospital visit. The medical records were admitted in court over [d]efense [c]ounsel's objections. Also over [d]efense [c]ounsel's objection, Trooper Carroll was allowed to testify that the medical records showed that [Arroyo-O'Neill] tested positive for alcohol and marijuana, but negative for cocaine and opiates, such as heroin.

At the barracks, Trooper Carroll conducted a field drug test on the substance that appeared to be marijuana, which tested positive as marijuana, and on one of the two bags that both appeared to be cocaine, which tested positive as cocaine. Trooper Carroll testified that one bag later tested positive as heroin, which people usually package in glassine packets of 0.2 grams, so he estimated that [Arroyo-O'Neill] had the equivalent of over 1,000 of such packets. Trooper Carroll testified that suspected heroin [wa]s not field tested because it may [have] contain[ed] Fentanyl, a narcotic that can be lethal in a small do[se]. Trooper Carroll testified that the amount of cocaine for personal use is usually the equivalent of a thumbnail, and the amount of crack cocaine for personal use is usually the equivalent of a pebble. Both [t]roopers admitted to not being on the Drug Task Force, and Trooper Carroll admitted to giving inconsistent testimony at the preliminary hearing about the

presence of heroin but stated that the drug lab report was not yet available for that hearing.

A forensic scientist of nearly sixteen years who worked in the Drug Identification Unit at the Wyoming Regional Laboratory and qualified as an expert witness testified that she tested the drugs found on [Arroyo-O'Neill] and prepared the lab report admitted as evidence. The testing consisted of receiving the substances in a sealed package, opening the package in a way to maintain the original seal, weighing the substances, and conducting both a presumptive and confirmatory test to identify whether a controlled substance is present. The forensic scientist identified 17.97 grams of marijuana in one bag, 27.01 grams of heroin in the second bag, 73.19 grams of cocaine in the third bag, and 14.13 grams of cocaine in the fourth bag. The scientist also testified that from experience, a person can kind of determine what a substance is but cannot do so definitively without the proper test.

Pennsylvania State Trooper [Gina] Tasselmyer, who had twenty-five years of experience with the Pennsylvania State Police, serving exclusively in drug law enforcement since 1993, testified for the Commonwealth as an expert witness on drug investigation, identification, and packaging. As part of her experience, [Trooper] Tasselmyer received extensive drug law enforcement training, worked with federal agencies, worked undercover making drug purchases (including cocaine and heroin), worked with the Vice Unit on street-level drug operations, trained other officers on drug law enforcement, and testified as an expert witness about drug investigation, identification, and packaging. Trooper Tasselmyer testified that the typical packet of heroin in Pike County averages about 0.2 grams at $10.00 per packet, and during undercover street purchases, she has purchased between one to fifty packets. She testified that cocaine sells for about $100 per gram. Trooper Tasselmyer also testified that drug dealers commonly carry two or more cell phones and do not use landlines. She further testified that users as opposed to dealers typically carry a device for drug use. In addition, Trooper Tasselmyer testified that she has encountered the amounts of heroin and cocaine identified in this case during search warrants but not street buys and that the amounts are consistent with drug dealing but not personal use. Finally, Trooper Tasselmyer testified that it is not unusual for

drug dealers to carry large amounts of money in various denominations in order to conduct their business.

Trial Court Pa.R.A.P. 1925(a) Opinion, 6/9/2016, at 1-7 (record citations omitted).

To prove PWID,[4] the Commonwealth must establish that the defendant possessed a controlled substance and intended to deliver it. **Commonwealth v. Bostick**, 958 A.2d 543, 560 (Pa. Super. 2008). Intent to deliver may be inferred from the circumstances surrounding his possession of the controlled substance. **Id**. A factfinder may infer possession with intent to deliver from the possession of a large quantity of a controlled substance. **Id**. Other relevant factors include "the manner in which the controlled substance was packaged, the behavior of the defendant, the presence of drug paraphernalia, and large sums of cash found in possession of the defendant." **Commonwealth v. Ratsamy**, 934 A.2d 1233, 1237-1238 (2007) (citation omitted). Expert testimony is permissible to show the manner in which the defendant possessed the controlled substance is consistent with an intent to deliver. **Id**. at 1238 (citation omitted).

The record establishes that Arroyo-O'Neill possessed plastic baggies containing, respectively, approximately 27.01 grams of heroin, 73.19 grams and 14.31 grams of cocaine. Trooper Carroll and Trooper Pajalich both

---

[4] 35 P.S. § 780-113(a)(30).

testified that they had never seen so large an amount of narcotics on one person in their police careers. Arroyo-O'Neill also had a large amount of cash on his person. There was no evidence that any paraphernalia that the troopers found was used for actual consumption of narcotics. Trooper Tasselmyer provided an expert opinion, based on her training and experience, that the drugs in Arroyo-O'Neill's possession were for the purpose of drug dealing, not for his own personal use. This evidence was sufficient to support Arroyo-O'Neill's conviction for PWID.

To prove DUI – general impairment,[5] the Commonwealth must prove "the accused was driving, operating, or in actual physical control of the movement of a vehicle during the time when he or she was rendered incapable of safely doing so due to the consumption of alcohol." *Commonwealth v. Segida*, 985 A.2d 871, 879 (Pa. 2009). A person is incapable of safe driving when "alcohol has substantially impaired the normal mental and physical faculties required to safely operate the vehicle." *Commonwealth v. Palmer*, 751 A.2d 223, 228 (Pa. Super. 2000), *citing Commonwealth v. Montini*, 712 A.2d 761, 768 (Pa. Super. 1998). "Substantial impairment, in this context, means a diminution or enfeeblement in the ability to exercise judgment, to deliberate or to react prudently to changing circumstances and conditions." *Montini*, 712 A.2d at 768. Factors such as erratic driving, failing field sobriety tests, and the

---

[5] 75 Pa.C.S. § 3802(a)(1).

defendant's blood alcohol level are indicative of substantial impairment. **Id**. Additional factors include an officer's observations that the defendant smells of alcohol, has glassy or bloodshot eyes, and has difficulty walking. **Palmer**, 751 A.2d at 228.

The troopers observed Arroyo-O'Neill driving erratically by swerving into the wrong lane, fleeing from the police, and driving the wrong way on the highway and its on-ramp. When the troopers ultimately apprehended Arroyo-O'Neill, he smelled of alcohol and slurred his speech. A cup of alcohol was found in the center console of Arroyo-O'Neill's vehicle and Trooper Pajalich testified he heard Arroyo-O'Neill admit to hospital staff that he had been drinking. This evidence was sufficient for the jury to conclude that the Commonwealth proved beyond a reasonable doubt that Arroyo-O'Neill was in actual physical control of a motor vehicle and was intoxicated by alcohol to a degree that rendered him incapable of safe driving.

In his third and fourth arguments, which we review together, Appellant contends that his guilty verdicts for PWID and DUI are against the weight of the evidence. The law pertaining to weight of the evidence claims is well-settled.

> A motion for a new trial based on a claim that the verdict is against the weight of the evidence is addressed to the discretion of the trial court. **Commonwealth v. Widmer**, 560 Pa. 308, 319, 744 A.2d 745, 751-52 (2000); **Commonwealth v. Brown**, 538 Pa. 410, 435, 648 A.2d 1177, 1189 (1994). A new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion. **Widmer**, 560 A.2d at 319-20,

744 A.2d at 752. Rather, "the role of the trial judge is to determine that 'notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice.'" *Id.* at 320, 744 A.2d at 752 (citation omitted). It has often been stated that "a new trial should be awarded when the jury's verdict is so contrary to the evidence as to shock one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail." *Brown*, 538 Pa. at 435, 648 A.2d at 1189.

An appellate court's standard of review when presented with a weight of the evidence claim is distinct from the standard of review applied by the trial court:

> Appellate review of a weight claim *is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence*. *Brown*, 648 A.2d at 1189. Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. *Commonwealth v. Farquharson*, 467 Pa. 50, 354 A.2d 545 (Pa. 1976). One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.

*Widmer*, 560 Pa. at 321-22, 744 A.2d at 753 (emphasis added).

*Commonwealth v. Clay*, 64 A.3d 1049, 1054-55 (Pa. 2013)

With regard to PWID, Arroyo-O'Neill claims the evidence was "contradictory" because "the amount of the drugs was only enough to fit into one pocket of [Arroyo-O'Neill's] cargo shorts," no scales or additional bags were used for packaging, and the troopers did not discover cash on Arroyo-O'Neill's person during their initial search at the scene of his arrest.  Arroyo-

O'Neill's Brief at 30-31. Arroyo-O'Neill ignores the Commonwealth's expert testimony that the amounts of drugs in Arroyo-O'Neill's possession were consistent with drug dealing and the troopers' testimony that they had never seen such a large amount of drugs on one person. The trial court acted within its discretion in determining that the verdict did not shock its conscience.

With regard to DUI, Arroyo-O'Neill contends that he only crossed the fog line once; the troopers failed to conduct field sobriety tests; and he had bloodshot and watery eyes because the troopers tased and pepper-sprayed him, not because he was intoxicated. Arroyo-O'Neill ignores the police observations of his manner of driving, the odor of alcohol emanating from his person, his slurred speech, the cup of alcohol discovered in his vehicle, and his admission to hospital staff that he had been drinking. Once again, the trial court acted within its discretion in determining that the verdict did not shock its conscience.

In his fifth issue on appeal, Arroyo-O'Neill argues that the trial court erred in denying his motion to suppress evidence seized as a result of his traffic stop.

This Court applies the following standard in reviewing the denial of a motion to suppress:

> [An appellate court's] standard of review in addressing a challenge to the denial of a suppression motion is limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions

drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, [the appellate court is] bound by [those] findings and may reverse only if the court's legal conclusions are erroneous. Where ... the appeal of the determination of the suppression court turns on allegations of legal error, the suppression court's legal conclusions are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts. Thus, the conclusions of law of the courts below are subject to [ ] plenary review.

*Commonwealth v. Jones*, 988 A.2d 649, 654 (Pa. 2010). "Further, [i]t is within the suppression court's sole province as factfinder to pass on the credibility of witnesses and the weight to be given their testimony." *Commonwealth v. Houck,* 102 A.3d 443, 455 (Pa. Super. 2014) (citations omitted). Our scope of review from a suppression ruling is limited to the evidentiary record created at the suppression hearing. *In re L.J.,* 79 A.3d 1073, 1087 (Pa. 2013).

Arroyo-O'Neill argues:

Trooper Carroll indicated during the [s]uppression [h]earing that he first noticed [Arroyo-O'Neill] driving northbound on State Route 739 and the reason for the stop was because [Arroyo-O'Neill] was traveling northbound in the southbound lane on State Route 739 and continued to drive in that lane. (S.H.T. 12/18/2014, pg. 7:15-21). However, it is important to note that Trooper Carroll also contradicted said testimony at both the [p]reliminary [h]earing[6] and [s]uppression [h]earing by

---

[6] The preliminary hearing transcript is not in the record. Therefore, Arroyo-O'Neill has waived his right to argue that Trooper Carroll's testimony during the suppression hearing contradicted his preliminary hearing testimony.

- 14 -

indicating that [Arroyo-O'Neill] was first observed *at* the temporary red light on State Route 739. (S.H.T. 12/18/2014, pg. 8:14-23) (emphasis added).

Despite Trooper Carroll's testimony[,] when viewing the dash camera video it is evident that [Arroyo-O'Neill] is driving northbound in the northbound lane. At no point in the video is [Arroyo-O'Neill] driving northbound in the southbound lane. Trooper Carroll follows [Arroyo-O'Neill] for about a quarter mile and then activates his lights for an alleged infraction that occurred a quarter mile back down the road. (S.H.T. 12/18/2014, pg. 9:9-21). Despite the claim that [Arroyo-O'Neill] was driving northbound in the southbound lane no summary citation was issued to [Arroyo-O'Neill] for the initial infraction which begs one to question if the initial infraction ever actually occurred.

[Arroyo-O'Neill] respectfully argues that no infraction occurred and the [t]roopers did not have reasonable suspicion to pull [Arroyo-O'Neill's] vehicle over[.]

Arroyo-O'Neill's Brief at 20-21.

Arroyo-O'Neill misconstrues the evidence. Trooper Carroll, the sole witness during the suppression hearing, testified on cross-examination, as follows:

Q. Trooper Carroll, when you saw [Arroyo-O'Neill] driving his vehicle, at what point on [State Route] 739 did you see him?

A. We saw him just south of the Weis market there was a temporary construction traffic light there.
.
Q. You were stopped at the red light?

A. We were stopped at the red light, yes.

_____

*See Commonwealth v. Houck*, 102 A.3d 443, 456-57 (Pa. Super. 2014) (where appellant has not made transcript of proceedings at issue part of certified record, any claims that cannot be resolved in absence of necessary transcript must be deemed waived).

Q. During your preliminary – there was a Preliminary Hearing held in this matter, correct?

A. Yes.

Q. During that hearing you took an oath similar to the oath you took today?

A. Correct.

Q. During that hearing you indicated that [Arroyo-O'Neill] was traveling northbound in the southbound lane, correct.

A. Correct.

Q. That was the reason that you pulled him over?

A. Correct.

Q. Additionally, during that period you also stated that he continued to drive northbound in the southbound lane, correct?

A. Correct.

Q. You still agree today that that would be the case?

A. That's correct.

Q. Now, today you said that you turned the camera on around the bridge right before 84?

A. Correct.

Q. So, it was not prior to you getting to the bridge?

A. The lights – when the lights go on, the camera is activated and there's an approximate delay – it goes back a little bit before you turn the switch on, so I'm not sure exactly where the camera went on, but it was around the bridge, yes.

Q. Now, also during your Preliminary Hearing that was held on cross examination you indicated that you first noticed [Arroyo-O'Neill's] car when you were stopped at the red light on 739, correct and that it was traveling northbound?

A. Correct.

Q. However, then when asked where [Arroyo-O'Neill's] car was located, you said at the temporary light, red light on State Route 739, correct?

A. Correct.

Q. Now, at that light that's when you turned around?

A. Yes.

Q. To follow [Arroyo-O'Neill]?

A. Correct.

Q. So, before turning around you never activated the video?

A. Correct.

Q. You begin following [Arroyo-O'Neill]?

A. Yes.

Q. You did not immediately activate your lights, correct?

A. We turned the lights on when we caught up to him.

Q. About a half mile later?

A. Around the bridge.

N.T., 12/18/2014, at 7-9.

The suppression hearing transcript reflects Trooper Carroll testified that he first observed Arroyo-O'Neill driving his vehicle *while the trooper himself* was stopped at a temporary construction red light. Furthermore, Trooper Carroll confirmed that at the preliminary hearing he indicated

Arroyo-O'Neill was driving northbound in the southbound lane. *Id.* Trooper Carroll agreed that at the preliminary hearing that "when asked where [Arroyo-O'Neill's] car was **located**, you said at the temporary light, red light …." *Id.*, at 7-8. Trooper Carroll also agreed, "Now, at that light that's when you turned around?" *Id.*, at 8.

Accepting the trooper's testimony as credible, the trial court found that "Trooper Carroll witnessed [Arroyo-O'Neill] driving in the officer's lane of traffic and proceeding thereafter along that road in the opposite lane of traffic." Suppression Order, 2/11/2015, at 4 (unnumbered). The record supports the court's finding of fact. Further, Arroyo-O'Neill's argument that "at no point in the video" was he driving in the wrong lane is is unavailing since Trooper Carroll testified that the video did not activate until he turned on the police vehicle's overhead lights "when we caught up to him." N.T., 12/18/2014, at 9.

Here, Trooper Carroll witnessed Arroyo-O'Neill driving northbound in the southbound lane of Route 739 in violation of the Motor Vehicle Code. This conduct was sufficient to support a finding that Trooper Carroll had probable cause to initiate the traffic stop. *See Commonwealth v. Salter*, 121 A.3d 987, 993 (Pa. Super. 2015) ("If it is not necessary to stop the vehicle to establish that a violation of the Vehicle Code has occurred, an officer must possess probable cause to stop the vehicle."); *Commonwealth v. Enick*, 70 A.3d 843 (Pa. Super. 2013) (holding officer had probable cause

to stop vehicle after observing vehicle briefly cross double yellow line into oncoming traffic).   Accordingly, the trial court properly denied Arroyo-O'Neill's suppression motion.

In his sixth issue, Arroyo-O'Neill contends that the trial court erred and abused its discretion in denying his motion *in limine* to preclude medical records from Wayne Memorial Hospital because the records were hearsay evidence.

The relevant facts are as follows:  In October of 2014, almost one year before trial, the Commonwealth provided Arroyo-O'Neill with a copy of his hospital records from the night of his arrest.  On September 11, 2015, the date of jury selection, the court scheduled trial for September 21, 2015.  On Friday, September 18, 2015, the Commonwealth provided Arroyo-O'Neill with a Certification of Hospital Records that it planned to use to enter the records into evidence during trial without a witness.  On September 21, 2015, Arroyo-O'Neill filed an amended motion *in limine,* objecting to the Commonwealth's plan to admit the records through the certification instead of through testimony by a records custodian.  That same day, prior to the commencement of trial, the court heard argument on Arroyo-O'Neill's motion.  Arroyo-O'Neill contended, *inter alia*, that (1) the Commonwealth violated Pa.R.E. 902(11) by failing to provide the certification until "the 11th

hour,"[7] and (2) testimony about the substance of the records violated his constitutional right to cross examine his accuser. The court denied the motion. Subsequently, over Arroyo-O'Neill's renewed objection, the trial court permitted Trooper Carroll to testify that the records showed that Arroyo-O'Neill tested positive for alcohol and marijuana on the night of his arrest.

Regarding Arroyo-O'Neill's hearsay objection, we review evidentiary rulings for abuse of discretion. *Commonwealth v. Poplawski*, 130 A.3d 697, 716 (Pa. 2015). We will not find abuse of discretion merely because we might have reached a different conclusion but only on the basis of manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support so as to be clearly erroneous. *Id.*

Pennsylvania Rule of Evidence 803 provides, in relevant part:

The following are not excluded by the rule against hearsay, regardless of whether the declarant is available as a witness: …

(6) Records of a Regularly Conducted Activity. A record (which includes a memorandum, report, or data compilation in any form) of an act, event or condition if,

(A) the record was made at or near the time by--or from information transmitted by--someone with knowledge;

(B) the record was kept in the course of a regularly conducted activity of a "business", which term includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit;

---

[7] N.T., 9/21/2015, at 12.

> (C) making the record was a regular practice of that activity;
>
> (D) all these conditions are shown by the testimony of the custodian or another qualified witness, or **by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification**; and
>
> (E) neither the source of information nor other circumstances indicate a lack of trustworthiness.

Pa.R.E. 803(6)(emphasis added).

Rule 902 provides in relevant part:

> The following items of evidence are self-authenticating; they require no extrinsic evidence of authenticity in order to be admitted …
>
> (11) Certified Domestic Records of a Regularly Conducted Activity. The original or a copy of a domestic record that meets the requirements of Rule 803(6)(A)-(C), as shown by a certification of the custodian or another qualified person that complies with Pa.R.C.P. No. 76. Before the trial or hearing, the proponent must give an adverse party **reasonable written notice** of the intent to offer the record – and must make the record and certification available for inspection – so that the party has a fair opportunity to challenge them.

Pa.R.E. 902(11) (emphasis added).

Arroyo-O'Neill contends the Commonwealth did not properly satisfy the requirements of Rule 902(11). Arroyo-O'Neill acknowledges that the Commonwealth had presented counsel with the medical records, but argues the Commonwealth did not provide a certification for purposes of entry of the medical records until three days before trial. Arroyo-O'Neill maintains that "providing [Arroyo-O'Neill] with the Certification three days before trial,

after the jury has been selected, is in no way reasonable." Arroyo-O'Neill's Brief at 22. We are not persuaded by this argument.

Here, the Commonwealth provided the medical records to Arroyo-O'Neill approximately 11 months prior to trial. Furthermore, during the on-the-record argument, the Commonwealth's attorney told the court that she had talked with Arroyo-O'Neill's attorney "about this issue … [a]t [j]ury selection in July when the Commonwealth requested a continuance [because] this is just really an issue of the Commonwealth having the Certification." N.T., 9/21/2015, at 12. In response, Arroyo-O'Neill's counsel stated she was aware that the medical records would be brought into evidence, but anticipated an individual to be present.

The trial court in support of its ruling reasoned:

As Pennsylvania case law has established, [Arroyo-O'Neill's] medical records meet the business records exceptions to the hearsay rule, and the contents found present in [Arroyo-O'Neill's] blood constituted facts and not opinions within those records. *Folger v. Dugan*, 876 A.2d 1049, 1055-56; [*Commonwealth v.*] *Seville*, 405 A.2d at 1265-66. Additionally, the [Commonwealth] provided the necessary certification to make the records self-authenticating. Pa. R.E. 902(11); *Dugan*, 876 A.2d 1049, 1055-56. Furthermore, the [Commonwealth] provided Defense Counsel with a copy of the medical records in October of 2014, almost a year before trial, giving [Arroyo-O'Neill] ample time to challenge the records. *Compare* Pa.R.E. 902(11) *with* Trial Transcript at 5-6, 10. Additionally, even though Defense Counsel only had approximately four days to review the certification itself, Trial Transcript at 5, 7, 11, the [Commonwealth] argued that Defense Counsel was aware since jury selection that the [Commonwealth] intended to admit the medical records by way of certification and was simply waiting on the certification. Trial Transcript at 12. While Defense Counsel countered that she

> anticipated having someone to cross-examine, Counsel's contention seemed to rest primarily with the [Commonwealth's] choice on how to proceed, not with any flaw in the certification itself. ***See*** Trial Transcript at 13.

Trial Court Opinion, 6/9/2016, at 30-31.

On this record, we find no abuse of discretion in the trial court's denial of the motion *in limine*.  In light of the fact that Arroyo-O'Neill's counsel had significant time to review and challenge the medical records, had been made aware prior to receiving the certification that the Commonwealth planned to admit the medical records by way of the certification, and was provided with the certification prior to trial, we conclude Arroyo-O'Neill's argument warrants no relief.

In his seventh issue, Arroyo-O'Neill contends the testimony of Trooper Carroll regarding statements in the medical records violated Arroyo-O'Neill's Sixth Amendment confrontation rights.  Whether Arroyo-O'Neill's rights under the Confrontation Clause were violated is an issue of law for which our standard of review is *de novo* and our scope of review is plenary. ***Commonwealth v. Yohe***, 79 A.3d 520, 530 (Pa. 2013), *cert. denied*, ***Yohe v. Pennsylvania***, 134 S. Ct. 2662 (2014).

The Confrontation Clause of the Sixth Amendment, made applicable to the States via the Fourteenth Amendment, ***Pointer v. Texas***, 380 U.S. 400 (1965), provides that "[i]n all criminal prosecutions,  the accused shall enjoy the right . . . to be confronted with the witnesses against him. . . ."  In ***Crawford v. Washington***, 541 U.S. 36 (2004), the United States Supreme

Court held that the Sixth Amendment guarantees a defendant's right to confront those "who bear testimony" against him, and defined "testimony" as "[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact." *Id*. at 51. The Court explained that the Confrontation Clause prohibits out-of-court testimonial statements by a witness unless the witness is unavailable and the defendant had a prior opportunity for cross-examination. *Id*. at 53–56.

In the present case, the trial court permitted Trooper Carroll to testify that the medical records indicated Arroyo-O'Neill had tested positive for marijuana and alcohol. The trial court, in support of its ruling, opines that the medical tests were not conducted for testimonial purposes at trial. Trial Court Opinion, 6/6/2016, at 32. Arroyo-O'Neill maintains the medical records "are clearly testimonial as they indicate what substances were in [Arroyo-O'Neill's] system and the Commonwealth failed to present the person who tested the blood and prepared the lab report." Arroyo O/Neill's Brief at 24.

In order to determine if a document or statement created out-of-court is testimonial in nature, our Supreme Court looks at the primary purpose of the document or statement. *Yohe*, 79 A.3d at 531-532 (citations omitted). A document or statement is testimonial if its primary purpose is "to establish or prove past events potentially relevant to later criminal prosecution." *Id.* at 531. (citation omitted). A document or statement has such a primary

purpose if it is created or given "under circumstances which would lead an objective witness reasonably to believe that the [document or] statement would be available for use at a later trial[.]" *Id.* (citation omitted).

At issue in *Yohe* was whether Dr. Blum, Assistant Laboratory Director at National Medical Services Labs ("NMS"), could testify about the toxicology report regarding the defendant's blood sample, drawn at a hospital following the defendant's DUI arrest, where (1) other lab technicians at NMS performed the actual tests on the defendant's blood and assembled the data from the tests, and (2) Dr. Blum analyzed the data and prepared the report, but did not personally test the defendant's blood sample. The *Yohe* Court held there was no Confrontation Clause violation because "the testimonial document was the certified Toxicology Report prepared and signed by Dr. Blum, and [] the Commonwealth met its obligation to present the analyst who signed the certificate to testify at trial[.]" *Yohe*, 79 A.3d at 541.

Here, the medical records at issue are not the same as the blood-alcohol analysis that was conducted in *Yohe* for the purpose of establishing the defendant's blood alcohol level. In fact, Arroyo-O'Neill refused a blood test. N.T., 9/21/2015, at 177. Nonetheless, we conclude that, in light of the circumstances under which Arroyo-O'Neill was taken to the hospital emergency room by police, i.e., complaining of back pain following police investigation and apprehension during which he evidenced signs of intoxication, the medial records are testimonial as to the charge of DUI.

In the present case, Trooper Carroll is not a qualified analyst or medical witness and did not play any part in Arroyo-O'Neill's treatment at the hospital following his arrest. Nevertheless, the trial court permitted him to testify that the medical records showed that Arroyo-O'Neill tested positive for marijuana and alcohol. Since no qualified medical witness or lab technician testified, Arroyo-O'Neill could not cross-examine any medical witness or technician as to the accuracy of the records. Accordingly, we conclude that Trooper Carroll's testimony violated Arroyo-O'Neill's Confrontation Clause rights.

In any event, any error in the trial court's ruling admitting Arroyo-O'Neill's medical records through certification and Trooper Carroll's testimony would be harmless error.

Error is harmless if (1) the error did not prejudice the defendant or the prejudice was *de minimis*; (2) the erroneously admitted evidence was merely cumulative of other untainted, substantially similar evidence; or (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming, and the prejudicial effect of the error was so insignificant by comparison, that the error could not have contributed to the verdict. ***Commonwealth v. Atkinson***, 987 A.2d 743, 752 (Pa. Super. 2009) (concluding Sixth Amendment confrontation violation that occurred was harmless error).

Even without the medical records, there remained ample evidence to convict Arroyo-O'Neill on the DUI charge. The troopers identified Arroyo-O'Neill as the driver, and the videotape of the traffic stop confirmed their identification. Both troopers testified that the vehicle touched or partially crossed the fog line multiple times. The troopers testified, and the videotape shows, that while turning left onto the onramp to I-84, Arroyo-O'Neill's vehicle fully crossed the fog line. The vehicle then slowed and started to pull over multiple times before accelerating away from the troopers. Instead of stopping after the troopers carried out a PIT maneuver, Arroyo-O'Neill resumed driving the wrong way on Interstate 84 and the onramp. When apprehended, Arroyo-O'Neill smelled of alcohol, slurred his speech, and had bloodshot eyes. The troopers also found a cup with alcohol in Arroyo-O'Neill's vehicle, and Trooper Pajalich testified Arroyo-O'Neill admitted to hospital staff he had been drinking. Given this overwhelming evidence of guilt, the court's admission of Arroyo-O'Neill's medical records does not warrant a new trial on the DUI charge.

In his eighth and final claim, Arroyo-O'Neill argues that the court abused its discretion by running his sentence consecutive to a sentence previously imposed in another county (Lackawanna County),[8] because the

---

[8] Arroyo-O'Neill was sentenced in Lackawanna County on November 18, 2015. In the present case, the court sentenced Arroyo-O'Neill on December 3, 2015, and resentenced him on February 18, 2016.

Lackawanna County judge ordered that Arroyo-O'Neill's sentence in the present case would run concurrently with the Lackawanna County sentence.[9]

Arroyo-O'Neill challenges the discretionary aspects of his sentence. *Commonwealth v. Dodge*, 77 A.3d 1263, 1268 (Pa. Super. 2013) (*en banc*) (objection to consecutive sentences implicates discretionary aspects of sentence). There is no absolute right of appeal to challenge the discretionary aspects of sentence. *Commonwealth v. Hornaman*, 920 A.2d 1282, 1284 (Pa. Super. 2007). Before we can address a discretionary challenge, we must determine: (1) whether appellant has filed a timely notice of appeal; (2) whether the issue was properly preserved at sentencing or in a motion to reconsider and modify sentence; (3) whether appellant's brief has a fatal defect under Pa.R.A.P. 2119(f); and (4) whether there is a substantial question that the sentence appealed from is not appropriate under the Sentencing Code. *Commonwealth v. Swope*, 123 A.3d 333, 337 (Pa. Super. 2015).

Although Arroyo-O'Neill filed a timely notice of appeal, properly raised his discretionary aspects of sentencing claim at sentencing, and included the requisite Rule 2119(f) statement in his brief, he fails to raise a substantial question that his sentence is inappropriate "for reasons of partiality." Arroyo-O'Neill's Brief at 32 (Rule 2119(f) Statement). Here, the trial judge

---

[9] The docket in the Lackawanna County case states that Arroyo-O'Neill's sentence in that case "is concurrent" with the present case.

acted properly and within his discretion in ordering Arroyo-O'Neill's sentence to run consecutive to the Lackawanna County sentence. **See** Pa.R.Crim.P. 705 ("judge shall state whether the sentences run concurrently or consecutively"); 42 Pa.C.S. § 9721 (court "may impose [sentence] consecutively or concurrently"). The Lackawanna County judge did not have the authority to order its sentence to run concurrent to the present sentence, which came second in time. **See Commonwealth v. Holz**, 397 A.2d 407, 408 (Pa. 1979) (finding court erred in sentencing defendant to serve a term of imprisonment to run consecutively with a judgment of sentence which had not yet been imposed). As such, Arroyo-O'Neill fails to present a substantial question.

Accordingly, having reviewed the arguments of Arroyo-O'Neill, we find they present no basis upon which to grant relief from the judgment of sentence.

## APPEAL OF COMMONWEALTH
## 1161 EDA 2016

The Commonwealth appeals the trial court's determination that Arroyo-O'Neill is eligible for a sentence pursuant to the Risk Recidivism Reduction Incentive (RRRI) Act.[10]

The RRRI Act "seeks to create a program that ensures appropriate punishment for persons who commit crimes, encourages inmate participation

---

[10] 61 Pa.C.S. §§ 4501, *et seq*.

in evidence-based programs that reduce the risks of future crime and ensures the openness and accountability of the criminal justice process while ensuring fairness to crime victims." 61 Pa.C.S. § 4502. As part of achieving that aim, the RRRI Act requires the trial court to determine at the time of sentencing whether the defendant is an "eligible offender." 61 Pa.C.S. § 4505(a). If the court finds the defendant to be an eligible offender, or if the prosecuting attorney waives the eligibility requirements under section 4505(b), the trial court must calculate minimum and maximum sentences, and then impose the RRRI minimum sentence, which "shall be equal to three-fourths of the minimum sentence imposed when the minimum sentence is three years or less," or "shall be equal to five-sixths of the minimum sentence if the minimum sentence is greater than three years." 61 Pa.C.S. § 4505(c). If an eligible offender "successfully completes the program plan, maintains a good conduct record and continues to remain an eligible offender," he or she may "be paroled on the RRRI minimum sentence date unless the Board determines that parole would present an unreasonable risk to public safety or that other specified conditions have not been satisfied." 37 Pa. Code § 96.1(b).

To become eligible for a RRRI minimum sentence, the RRRI Act provides that a defendant must satisfy each of the following requirements, the first of which is presently at issue in the case at bar. Specifically, a defendant must establish that he:

**(1) Does not demonstrate a history of present or past violent behavior**.

(2) Has not been subject to a sentence the calculation of which includes an enhancement for the use of a deadly weapon as defined under law or the sentencing guidelines promulgated by the Pennsylvania Commission on Sentencing or the attorney for the Commonwealth has not demonstrated that the defendant has been found guilty of or was convicted of an offense involving a deadly weapon or offense under 18 Pa.C.S. Ch. 61 (relating to firearms and other dangerous articles) or the equivalent offense under the laws of the United States or one of its territories or possessions, another state, the District of Columbia, the Commonwealth of Puerto Rico or a foreign nation.

(3) Has not been found guilty of or previously convicted of or adjudicated delinquent for or an attempt or conspiracy to commit a personal injury crime as defined under section 103 of the act of November 24, 1998 (P.L. 882, No. 111) [18 P.S. § 11.103[11]], known as the Crime Victims Act, except for an offense under 18 Pa.C.S. § 2701 (relating to simple assault) when the offense is a misdemeanor of the third degree, or an equivalent offense under the laws of the United States or one of its territories or possessions, another state, the District of Columbia, the Commonwealth of Puerto Rico or a foreign nation.

(4) Has not been found guilty or previously convicted or adjudicated delinquent for violating any of the following provisions or an equivalent offense under the laws of the United States or one of its territories or possessions, another state, the District of Columbia, the Commonwealth of Puerto Rico or a foreign nation:

> 18 Pa.C.S. § 4302(a) (relating to incest).
> 18 Pa.C.S. § 5901 (relating to open lewdness).
> 18 Pa.C.S. Ch. 76 Subch. C (relating to Internet child pornography).

---

[11] The record does not reflect that Arroyo-O'Neill has ever committed a "personal injury crime."

Received a criminal sentence pursuant to 42 Pa.C.S. § 9712.1 (relating to sentences for certain drug offenses committed with firearms).

Any offense for which registration is required under 42 Pa.C.S. Ch. 97 Subch. H (relating to registration of sexual offenders).

(5) Is not awaiting trial or sentencing for additional criminal charges, if a conviction or sentence on the additional charges would cause the defendant to become ineligible under this definition.

(6) Has not been found guilty or previously convicted of violating section 13(a)(14), (30) or (37) of the act of April 14, 1972 (P.L. 233, No. 64), ... known as The Controlled Substance, Drug, Device and Cosmetic Act, where the sentence was imposed pursuant to 18 Pa.C.S. § 7508(a)(1)(iii), (2)(iii), (3)(iii), (4)(iii), (7)(iii) or (8)(iii) (relating to drug trafficking sentencing and penalties).

61 Pa.C.S. § 4503 (emphasis added).

Instantly, Arroyo-O'Neill is not disqualified from RRRI eligibility based on any of the offenses enumerated in Section 4503. **See** 61 Pa.C.S. § 4503(2)-(6). Rather, the question presented by the Commonwealth's appeal is whether Arroyo-O'Neill is ineligible for an RRRI sentence based on Section 4503(1), which disqualifies a defendant who has "a history of present or past violent behavior." 61 Pa.C.S. § 4503(1).

The RRRI Act does not define "a history of present or past violent behavior," but several recent decisions have analyzed its meaning. **See Commonwealth v. Chester**, 101 A.3d 56 (Pa. 2014); **Commonwealth v. Finnecy**, 135 A.3d 1028 (Pa. Super. 2016), *appeal denied*, ___ A.3d ___ (Pa. October 19, 2016); **Commonwealth v. Cullen-Doyle**, 133 A.3d 14

(Pa. Super. 2016), *appeal granted*, 138 A.3d 609 (Pa. 2016) (argued November 2, 2016).[12]

In **Chester**, the Pennsylvania Supreme Court addressed whether a conviction for first-degree burglary (burglary graded as a first degree felony) demonstrates "violent behavior" under 61 Pa.C.S. § 4503(1) as a matter of law. The **Chester** Court held that the defendant's history of first-degree burglary convictions rendered him ineligible under Section 4503(1) for RRRI treatment. Although burglary is not listed as a crime that automatically disqualifies a defendant from an RRRI sentence, **see** 61 Pa.C.S. § 4503(2)-(6), the Court construed Section 4503(1) as a broad, "catchall" provision that covers "violent behaviors not otherwise identified in the RRRI Act's definition of 'eligible offender.'" **Id**., 101 A.3d at 63.

The **Chester** Court reasoned first-degree burglary fit well within this catchall category, given the long legal tradition of treating burglary as a crime of violence because of the threat posed to citizens by intrusions into their homes. **Id**. at 64-65. Significantly, the Court

---

[12] The Pennsylvania Supreme Court granted the petition for allowance of appeal with regard to the following issue:

> Whether Petitioner is eligible for the RRRI program where he is convicted and being sentenced for a single count of first degree burglary, which he admits is a crime of violence, but where he has no other convictions demonstrating a "history of present or past violent behavior," as that term is used in the RRRI statute.

**Commonwealth v. Cullen-Doyle**, 138 A.3d 609 (Pa. 2016).

> decline[d] … to depart from our well established case law -- finding burglaries to be violent by their very nature -- to instead engage in a case-by-case evaluation into whether a particular burglary conviction constitutes 'violent behavior' under Section 4503(1) … [W]e believe a conviction for first-degree burglary, a crime of violence, constitutes violent behavior for purposes of Section 4503(1).

*Id*. at 65.  Thus, the defendant's multiple first-degree burglary convictions were "more than sufficient to form a 'history' of 'violent behavior' under section 4503(1)."  *Id.*

Subsequently, in **Cullen-Doyle**, this Court was faced with the question of "whether a single first-degree burglary conviction constitutes 'a history of present or past violent behavior' as that phrase is used in § 4503(1)." 133 A.3d at 20.  This Court held that the trial court acted within its discretion by denying RRRI treatment based on the defendant's single conviction for first-degree burglary.  *Id*. at 21-22.

In reaching its decision, the panel explained: "[W]hile the construction of the RRRI Act involves a question of law, the predicate inquiry surrounding Appellant's admission to the RRRI program under § 4503(1) also implicates the exercise of the court's discretion."  *Id*. at 20.  The panel opined:  "Of course, Appellant's quarrel is not that he did not commit a violent act but that he has no 'history' or sufficiently established record of violent behavior. In other words, Appellant's claim focuses upon the quantity of disqualifying behaviors that bar his admission to the RRRI program, not their quality."  *Id.* at 21.

The panel determined Section 4503(1)'s phrase, "present or past violent behavior," is equivalent to "**all** violent behavior," because "there can be no other type of violent behavior than that which occurs either in the present or in the past." *Id.* at 21 (emphasis in original). The panel stated: "Thus, so long as the record reliably demonstrates an occurrence of violent behavior, the trial court does not abuse its discretion in rejecting an application to the RRRI program."

The *Cullen-Doyle* Court held: "[A] **single conviction** for first-degree burglary, an admittedly violent act under long-standing Pennsylvania law, is sufficient to establish a present history of violent behavior. Hence, we conclude that the trial court did not err[] in denying Appellant's request for sentencing under the RRRI Act." *Id.* at 22 (emphasis supplied).

One month after *Cullen-Doyle*, this Court in *Finnecy* considered "whether a prior conviction for resisting arrest [18 Pa.C.S. § 5104] falls within the meaning of 'violent behavior' as used in Section 4503(1), rendering an offender ineligible for RRRI." *Finnecy*, 135 A.3d at 1034–1035. Although resisting arrest is not enumerated as a disqualifying offense in Section 4503, the *Finnecy* Court agreed with the trial court that resisting arrest is "a crime of violence that permits a trial court to find that a defendant has a history of violence such that he is ineligible for RRRI." *Id.* at 1037.

The **Finnecy** Court based its determination on (1) the language of 18 Pa.C.S. § 5104 that criminalizes resisting arrest where acts create "substantial risk of bodily injury" to a public servant or anyone else or require "substantial force to overcome the resistance"; and (2) decisions sustaining convictions under Section 5104 for conduct that compelled police officers to use substantial force in effectuating their arrests. **Id**. at 1035-36, *citing* **Commonwealth v. Thompson**, 922 A.2d 926 (Pa. Super. 2007); **Commonwealth v. Clark**, 761 A.2d 190 (Pa. Super. 2000).[13] The **Finnecy** Court reasoned:

> [C]onduct constituting resisting arrest, even by passive resistance, requires such a substantial use of force that an officer or offender may be harmed, thereby causing significant risk of injury, and invites the same potential for confrontation that greatly concerned the [Supreme] Court in considering the offense of first-degree burglary. Indeed, the **Chester** Court was concerned with 'the **possibility** of the use of deadly force against either the offender or the victim' and 'not the behavior that is actually exhibited' during the commission of the crime.

**Id**. at 1036, *citing* **Chester**, 101 A.3d at 65 (emphasis in original).

Turning to the present case, the Commonwealth argues that Arroyo-O'Neill is disqualified from RRRI eligibility because he has a "history of present or past violent behavior." 61 Pa.C.S. § 4503(1). Specifically, the Commonwealth argues, "Although Arroyo-O'Neill was not taken to trial on

---

[13] The **Finnecy** court also took into account a federal decision that section 5104 was a "crime of violence" for sentencing purposes under federal guidelines because "it involves conduct that presents a serious potential risk of physical injury to another." **Id**. at 1033, 1035, 1037 (citing **United States v. Stinson**, 592 F.3d 460, 466 (3d Cir. 2010)).

the charge of [r]esisting [a]rrest, his behavior as testified to by the [t]roopers was such that he created a serious potential for the risk of injury to the [t]roopers, to the other individual in his vehicle, and to the public."[14] Commonwealth Brief at 15. In addition, the Commonwealth maintains:

> The jury made a specific finding on its verdict sheet that Arroyo-O'Neill 'endangered a law enforcement officer or member of the general public by engaging in a high-speed chase.' *See* Verdict Slip 9/22/2015. Consistent with the ruling in **Finnecy**, the Commonwealth believes that Arroyo-O'Neill's actions should be considered violent behavior and as such should make him ineligible for RRRI.

*Id.* The Commonwealth further argues that Arroyo-O'Neill has a criminal history of "15 arrests, including two arrests for Resisting Arrest in conjunction with drug charges." *Id.* at 15-16.

Here, focusing on Arroyo-O'Neill's conviction for fleeing and eluding police in a high speed chase, we agree with the Commonwealth that this offense is "violent behavior" within Section 4503(1).[15] Specifically, the issue

---

[14] A charge of resisting arrest was set forth in the criminal complaint in this case, but was not included in the Information filed by the Commonwealth. The record does not disclose the reason the Commonwealth did not include the offense of resisting arrest in the Information. The docket indicates this charge was "Dismissed by Information."

[15] The Commonwealth argues that Arroyo-O'Neill has a history of other violent behavior that the trial court should have considered when assessing his RRRI eligibility. Commonwealth's Brief at 14-16. It points to the resisting arrest charge that was "Dismissed by Information" based upon the Commonwealth's decision not to prosecute Arroyo-O'Neill on that charge. It also points to Arroyo-O'Neill's two prior arrests in Scranton and Lackawanna County for resisting arrest that are listed in the presentence investigation report but that did not result in convictions. *Id.* Although the presentence

- 37 -

presented to this Court concerns the **quality** of Arroyo-O'Neill's behavior, *i.e.*, Arroyo-O'Neill's third degree felony conviction for fleeing and eluding police. As this question involves a question of statutory interpretation, our standard of review is *de novo* and the scope of review is plenary. **See Chester**, 101 A.3d at 60.

Section 3733, entitled "Fleeing or attempting to elude police officer," provides, in relevant part:

> **(a) Offense defined.--** Any driver of a motor vehicle who willfully fails or refuses to bring his vehicle to a stop, or who otherwise flees or attempts to elude a pursuing police officer, when given a visual and audible signal to bring the vehicle to a stop, commits an offense as graded in subsection (a.2).
>
> * * *
>
> **(a.2) Grading.--**
>
> (1) Except as provided in paragraph (2), an offense under subsection (a) constitutes a misdemeanor of the second degree. Any driver upon conviction shall pay an additional fine of $500. This fine shall be in addition to and not in lieu of all other fines, court expenses, jail sentences or penalties.
>
> (2) An offense under subsection (a) constitutes a felony of the third degree if the driver while fleeing or attempting to elude a police officer does any of the following:

---

investigation report states the Lackawanna County case and the present case both involved Arroyo-O'Neill "running and ultimately resisting arrest," Arroyo-O'Neill has no prior resisting arrest convictions, and in the present case the Commonwealth chose not to include the resisting arrest charge in the Information. Presentence Investigation Report, at 4. In light of our disposition, whether these non-convictions can or should have any bearing on Arroyo-O'Neill's RRRI eligibility is an issue that we need not and do not address here.

(i) commits a violation of section 3802 (relating to driving under influence of alcohol or controlled substance);

(ii) crosses a State line; or

**(iii) *endangers a law enforcement officer or member of the general public due to the driver engaging in a high-speed chase*.**

*Id*. (emphasis added).

The trial court opined that Section 4503(1) does not extend to fleeing and eluding by a high speed chase, because (1) unlike the crime of burglary at issue in **Chester**, this crime has not been historically recognized as a violent crime; (2) Section 4503(1) should not be broadened to apply whenever an offense has any risk of danger or harm; and (3) the definitions of "danger" and "endanger[ing]" do not reference violence. Trial Court Opinion, 6/9/2016, at 22–23. Although the trial court has authored a thoughtful analysis, we disagree.

Relevant to our decision are two cases, ***Commonwealth v. Bowen***, 55 A.3d 1254 (Pa. Super. 2012) (holding the maximum sentence of 6 months' incarceration set forth at 75 Pa.C.S. § 6503 for a second or subsequent violation of Section 3733 does not apply to a second or subsequent violation of Section 3733(a.2)(2)), *appeal denied*, 64 A.3d 630 (Pa. 2013), and ***In re R.C.Y.***, 27 A.3d 227 (Pa. Super. 2011) (holding juvenile court correctly graded appellant's adjudication of delinquency on charges of fleeing and eluding as a third degree felony in violation of 75 Pa.C.S. § 3733(a.2)(2)(iii)).

In **R.C.Y.**, this Court, in discussing Section 3733(a.2)(2)(iii), recognized that "[t]he legislature included this term ["high speed chase"] to indicate the enhanced penalties applied only in cases where the defendant's actions created an **extraordinary danger to the public at large or to police officer**." **Id.** at 230 (emphasis added).

Again, in **Bowen**, this Court discussed the legislative intent of 75 Pa.C.S. § 3733(a.2)(2), stating:

Specifically, in their comments introducing Section 3733(a.2)(2) to the Pennsylvania Senate, the supporting senators stated as follows:

Senator M.J. WHITE. Madam President, I apologize that my colleagues on the other side of the aisle did not have this amendment earlier. This is actually a rather simple amendment. The underlying offense in this bill refers to a driver of a motor vehicle who fails or refuses to stop when ordered to do so by a police officer. The existing amendment that was already there in the bill changes the grading of the offense.

I serve on the Pennsylvania Commission on Sentencing, and one of the complaints I get most frequently from judges and from law enforcement people is that the offense of a high-speed chase is undergraded. It is currently a misdemeanor with a $500 fine. My amendment is upgrading an aggravated offense of fleeing or not stopping for a police officer under two circumstances, when the driver is under the influence of drugs or alcohol, or crosses a State line. **My amendment would add a third aggravating factor that would move this into the felony classification, and that is when the driver endangers a law enforcement officer or a member of the general public due to engaging in a high-speed chase. I am told that these chases are extremely dangerous to the public, and I think they should be graded well beyond a $500 fine.**

Thank you.

The PRESIDENT. The Chair recognizes the gentleman from Berks, Senator O'Pake.

Senator O'PAKE. Madam President, would the gentlewoman consent to brief interrogation?

The PRESIDENT. The gentlewoman indicates that she will.

Senator O'PAKE. Madam President, under the gentlewoman's amendment, what would the penalty be?

Senator M.J. WHITE. Madam President, well, it would be a felony of the third degree. I am afraid it has been a long time since I practiced criminal law, so I do not remember what the range of penalties is for that particular offense.

Senator O'PAKE. **Madam President, counsel advises that in his opinion, the maximum would be up to 7 years in jail.**

Senator M.J. WHITE. Madam President, the sentencing guidelines would apply to whatever the minimum and maximum are under criminal law for a felony of the third degree.

Pennsylvania Senate Journal, 2006 Reg. Sess. No. 46 (emphasis added).

*Id.* at 1269.

Our decisions recognize that the Legislature graded the crime of fleeing and eluding as a felony of the third degree to address the "extreme[] danger[]" presented to police and the public where a driver engages in a high-speed chase. *Id.* In the same vein, in *Chester*, our Supreme Court pointed out that the burglary statute in effect when the defendant was charged distinguished first-degree burglary from second-degree burglary,

"as first-degree burglary contemplates the potential for confrontation, whereas second-degree burglary does not." **Chester**, 101 A.3d at 64. Likewise, resisting arrest entails "the same potential for risk of confrontation that greatly concerned the High Court in considering the offense of first-degree burglary [in **Chester**]." **Finnecy**, 135 A.3d at 1036.

Based upon the Legislature's decision to make a high speed chase an aggravating factor for purposes of grading due to the exceptional danger presented to police and the public, and guided by the rationales set forth in **Chester** and **Finnecy**, we conclude that a third-degree felony conviction for fleeing and eluding police in a high speed chase, 75 Pa.C.S. § 3733(a.2)(2)(iii), is "violent behavior" under Section 4503(1). Furthermore, pursuant to **Cullen-Doyle**, this single conviction constitutes a present history of violent behavior. Therefore, we conclude the trial court erred in granting Arroyo-O'Neill RRRI eligibility.

Notwithstanding our disposition in the Commonwealth's appeal, we need not remand for resentencing because vacating the RRRI minimum sentence does not disturb the court's sentencing scheme. **Compare Commonwealth v. Goldhammer**, 517 A.2d 1280, 1283–84 (Pa. 1986); **Commonwealth v. Williams**, 871 A.2d 254, 266 (Pa. Super. 2005) (if trial court errs in its sentence on one count in multi-count case, all sentences for all counts will be vacated so court can restructure its entire sentencing scheme).

Accordingly, we affirm the judgment of sentence in part, and vacate in part. The judgment of sentence of 8½ to 20 years' imprisonment is affirmed, and the RRRI minimum sentence of 84 months and 20 days is vacated. Jurisdiction relinquished.

Judge Jenkins did not participate in the consideration or decision of this case.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/10/2017